## D'OENCH, DUHME & CO., INC. *v.* FEDERAL DEPOSIT INSURANCE CORPORATION.

No. 206. Argued January 9, 1942.—Decided March 2, 1942.

*Messrs. John W. Giesecke* and *Harold C. Ackert,* with whom *Mr. Franklin E. Reagan* was on the brief, for petitioner.

450

452

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy* and *Messrs. Melvin H. Siegel, Paul A. Sweeney, Francis C. Brown,* and *James Kane* were on the brief, for respondent.

Mr. Justice Douglas delivered the opinion of the Court.

Respondent instituted this suit in the United States District Court for the Eastern Division of the Eastern

District of Missouri on a demand note for $5000, executed by petitioner in 1933 and payable to the Belleville Bank & Trust Co., Belleville, Illinois. Respondent insured that bank January 1, 1934; and it acquired the note in 1938 as part of the collateral securing a loan of over $1,000,000 to the bank, made in connection with the assumption of the latter's deposit liabilities by another bank. Since 1935 the note had been among the charged off assets of the bank. The note was executed by petitioner in renewal of notes which it had executed in 1926. Petitioner, who was engaged in the securities business at St. Louis, Missouri, had sold the bank certain bonds which later defaulted. The original notes were executed to enable the bank to carry the notes and not show any past due bonds. Proceeds of the bonds were to be credited on the notes.[1] The receipts for the notes contained the statement, "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." Respondent had no knowledge of the existence of the receipts until after demand for payment on the renewal note was made in 1938. Certain interest payments on the notes were made prior to renewal for the purpose of keeping them "as live paper." Petitioner's president, who signed the original notes, knew that they were executed so that the past due bonds would not appear among the assets of the bank, and that the purpose of the interest payments was "to keep the notes alive." The original notes were signed in St. Louis, Missouri, were payable at petitioner's office there, and were delivered to the payee in Illinois. The evidence does not disclose where the note sued upon was signed, though it was dated at Belleville, Illinois, and payable to the bank there.

---

[1] The bank sold some of the bonds in 1937 for $100 and credited this amount to interest due on the note. This credit paid interest to May 1, 1933. No later payments were made on the note.

The main point of controversy here revolves around the question as to what law is applicable. The District Court held that Illinois law was applicable and that petitioner was liable. The Circuit Court of Appeals applied "general law" to determine that the note was an Illinois rather than a Missouri contract; and it decided that, under Illinois law, respondent was the equivalent of a holder in due course and entitled to recover. 117 F. 2d 491. Petitioner contends that, under the rule of *Klaxon Co.* v. *Stentor Electric Mfg. Co.*, 313 U. S. 487, a federal court sitting in Missouri must apply Missouri's conflict of law rules; that if, as was the case here, Illinois law was not pleaded or proved, a Missouri court would have ascertained Illinois law from Missouri decisions, since in such a case Illinois law would be presumed to be the same as the Missouri law; and that the District Court was bound to follow that same course. We granted the petition for certiorari because of the asserted conflict between the decision below and *Klaxon Co.* v. *Stentor Electric Mfg. Co., supra.*

We held in the latter decision that a failure of a federal court in a diversity of citizenship case to follow the forum's conflict of laws rules "would do violence to the principle of uniformity within a state" upon which *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, was based. 313 U. S. at p. 496. The jurisdiction of the District Court in this case, however, is not based on diversity of citizenship. Respondent, a federal corporation, brings this suit under an Act of Congress authorizing it to sue or be sued "in any court of law or equity, State or Federal." [2] Sec. 12 B, Federal

[2] That subdivision of the Act further provides: "All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States: *Provided,* That any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the

Reserve Act; 12 U. S. C. § 264 (j); 48 Stat. 162, 168, 172; 49 Stat. 684, 692. And see 28 U. S. C. § 42, 43 Stat. 941. Whether the rule of the *Klaxon* case applies where federal jurisdiction is not based on diversity of citizenship, we need not decide. For we are of the view that the liability of petitioner on the note involves decision of a federal, not a state, question under the rule of *Deitrick* v. *Greaney*, 309 U. S. 190.

Petitioner in its answer alleged that the note was given without any consideration whatever and with the understanding that no suit would be brought thereon; and that respondent was not a holder in due course. Respondent in its reply alleged that petitioner was estopped to assert those defenses on the grounds that the note was executed for the purpose of permitting the bank to avoid having its records show any past due bonds; that this constituted a misrepresentation which would deceive the creditors of the bank, the state banking authorities and respondent; that petitioner participated in the misrepresentation not only by reason of its knowledge as to the purpose which the note would serve but also by reason of its payment of interest in order to make the notes appear as a good asset. The District Court held that respondent was an innocent holder of the note in good faith and for value and that petitioner was estopped to assert want of consideration as a defense.

Sec. 12 B (s) of the Federal Reserve Act, 12 U. S. C. § 264 (s), provides that "Whoever, for the purpose of obtaining any loan from the Corporation . . . or for the purpose of influencing in any way the action of the Corporation under this section, makes any statement, know-

---

rights or obligations of depositors, creditors, stockholders and such State bank under State law shall not be deemed to arise under the laws of the United States." And see S. Rep. No. 1007, 74th Cong., 1st Sess., p. 5.

ing it to be false, or wilfully overvalues any security, shall be punished by a fine of not more than $5,000, or by imprisonment for not more than two years, or both." Subdivision (y) of the same section provided, at the time respondent insured the Belleville bank,[3] that such a state bank "with the approval of the authority having supervision" of the bank and on "certification" to respondent "by such authority" that the bank "is in solvent condition" shall "after examination by, and with the approval of" the respondent be entitled to insurance.[4]

These provisions reveal a federal policy to protect respondent, and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which respondent insures or to which it makes loans. If petitioner and the bank had arranged to use the note for the express purpose of deceiving respondent on insurance of the bank, or on the making of the loan, the case would be on all fours with *Deitrick* v. *Greaney, supra.* In that case, the defendant, for the purpose of concealing a national bank's acquisition of its own stock, had the shares held by a straw man and executed a note to the bank, it being agreed that the shares were to be held for the bank and that he was not to be liable on the note. We held as a

---

[3] These provisions of subdivision (y) were dropped when § 12 B was amended by the Banking Act of 1935. 49 Stat. 684. See S. Rep. No. 1007, 74th Cong., 1st Sess., p. 9.

[4] Subdivision (y) also gave respondent power to prescribe rules and regulations for the further examination of such bank. Though subdivision (y) was revised in 1935, as indicated in note 3, *supra,* subdivision (k) (2) of the amended Act gave respondent's examiners power "to make a thorough examination of all the affairs" of such banks and in doing so "to administer oaths and to examine and take and preserve the testimony of any of the officers and agents thereof." They were directed to make a "full and detailed report of the condition of the bank to the Corporation." 12 U. S. C. § 264 (k) (2).

matter of federal law, based on the policy of the National Banking Act to prevent the impairment of a bank's capital resources by prohibiting such acquisitions, that the defendant could not rely on his own wrongful act to defeat the obligation of the note as against the receiver of the bank. The defendant's act was itself a violation of the statute. 309 U. S. p. 198. But the reach of the rule which prevents an accommodation maker of a note from setting up the defense of no consideration against a bank or its receiver or creditors is not delimited to those instances where he has committed a statutory offense. As indicated by the cases cited in the *Deitrick* case (309 U. S. p. 198), an accommodation maker is not allowed that defense as against the receiver of the bank and its creditors, or at times even as against the bank itself, where his act contravenes a general policy to protect the institution of banking from such secret agreements. In some of those cases, the accommodation maker was party to the scheme of deception, in the sense that he had full knowledge of the intended use of the paper. *Putnam v. Chase*, 106 Ore. 440, 212 P. 365; *Vallely v. Devaney*, 49 N. D. 1107, 194 N. W. 903; *Niblack v. Farley*, 286 Ill. 536, 122 N. E. 160; *Cedar State Bank v. Olson*, 116 Kan. 320, 226 P. 995; *Bay Parkway Nat. Bank v. Shalom*, 270 N. Y. 172, 200 N. E. 685; *German-American Finance Corp. v. Merchants & Mfrs. State Bank*, 177 Minn. 529, 225 N. W. 891. In others he had "no positive idea of committing any fraud upon any one." *Denny v. Fishter*, 238 Ky. 127, 129, 36 S. W. 2d 864, 865; *Iglehart v. Todd*, 203 Ind. 427, 442, 178 N. E. 685; *Mount Vernon Trust Co. v. Bergoff*, 272 N. Y. 192, 5 N. E. 2d 196. And see *Pauly v. O'Brien*, 69 F. 460; Williston on Contracts (Rev. Ed.) § 1632. Yet, he has not been allowed to escape liability on the note as against the receiver even though he was "very ignorant and ill-informed of the character of the

transaction." *Rinaldi* v. *Young,* 67 App. D. C. 305, 307, 92 F. 2d 229, 231. Indeed, recovery was allowed by the bank itself in *Mount Vernon Trust Co.* v. *Bergoff, supra,* where the court said (272 N. Y. p. 196, 5 N. E. 2d 197): "The defendant may not have intended to deceive any person, but when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced."

Furthermore, the fact that creditors may not have been deceived or specifically injured is irrelevant. As we held in the *Deitrick* case (309 U. S. p. 198), it is the "evil tendency" of the acts to contravene the policy governing banking transactions which lies at the root of the rule. See 7 Zollman, Banks & Banking (1936) § 4783.

Those principles are applicable here, because of the federal policy evidenced in this Act to protect respondent, a federal corporation, from misrepresentations made to induce or influence the action of respondent, including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans. Those principles call for an affirmance of the judgment below.

Petitioner, at the time it executed the renewal note in 1933, did not know that it was to be used to deceive respondent, as the Act creating respondent was not passed until later. But the permission which it gave the bank to carry the note as a real asset was a continuing one and not revoked. That permission must be presumed to have

included authority for the bank to treat the note as genuine for purposes of examination at the hands of the public authorities as well as for its general banking activities.

Respondent insured the bank in 1934. The loan was made in 1938 to satisfy respondent's liability to the depositors of the bank under that insurance agreement. Respondent was authorized to insure such a bank only on a certificate from the state authority that the bank was solvent. We assume that such certificate was given, for to assume otherwise would be to infer that respondent did not discharge its statutory duties. The genuineness of assets ostensibly held by a bank is certainly germane to a determination of solvency. Clearly respondent is a member of the creditor class which the banking authorities were intended to protect. Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners. If the bank had wilfully padded the bank's assets with the spurious note in order to obtain insurance from respondent, there seems no doubt but that § 12 B (s) would have been violated. Moreover, as we have seen, the inability of an accommodation maker to plead the defense of no consideration does not depend on his commission of a penal offense. The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled. As we have said, petitioner's authority to the bank to use this note was a continuing one. The use to which it was put was not unusual but within the normal scope of banking activities. The fact that the note was charged off by the bank subsequent to the time when respondent insured

the bank and prior to the time when it acquired the note under the loan is immaterial. A note may be nonetheless an asset though it is charged off. And respondent is suing here to protect its rights as an insurer, a relationship with the bank which was created prior to the time when the note was charged off. The fact that subsequently respondent learned that the note had been charged off certainly was not notice that the note was spurious. It is indeed clear that at no time prior to the demand for payment did respondent know that the note was not genuine: It needs no argument to demonstrate that the integrity of ostensible assets has a direct relation to solvency. And it is no more a defense here than it was in the *Deitrick* case that no damage was shown to have resulted from the fraudulent or unlawful act. The federal policy expressed in the Act, like its counterpart in state law, is not dependent on proof of loss or damage caused by the fraudulent practice.

Though petitioner was not a participant in this particular transaction and, so far as appears, was ignorant of it, nevertheless it was responsible for the creation of the false status of the note in the hands of the bank. It therefore cannot be heard to assert that the federal policy to protect respondent against such fraudulent practices should not bar its defense to the note. Criminal penalties are no more the sole sanctions of the federal policy expressed in this Act than were the criminal penalties imposed on the agreement in the *Deitrick* case. If the secret agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose of the statute by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible. The federal policy under this Act of protecting respondent in its various functions against such arrangements is

no less clear or emphatic than the federal policy of out-lawing purchases by a bank of its own stock involved in the *Deitrick* case. Cf. *Rinaldi* v. *Young, supra; Federal Deposit Ins. Corp.* v. *Woods,* 34 F. Supp. 296.

*Affirmed.*

MR. JUSTICE ROBERTS did not participate in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER:

The CHIEF JUSTICE and I concur in the result on the ground that in the circumstances of this case respondent is entitled to recover, whatever law be deemed controlling. If Illinois law governs, respondent is admittedly entitled to recover as a holder in due course. If Missouri law governs, petitioner is estopped to assert the defenses on which it now relies. Whether the case is governed by the law of one State or the other, or by "federal common law," drawn here from one State or the other, the result is the same.

When the original accommodation notes were executed in 1926, petitioner fully knew that the whole transaction was aimed at giving the bank an appearance of assets where there were none. Petitioner's representative admitted that the bank "suggested that we issue a note to the Bank," which would enable it "to carry this note and not show any past due paper." He had been in the investment security business since 1910; he "knew what the bank meant," and that it was subject to periodic examinations by the state bank examiner, and he assumed the bank did not want past due paper. On these facts the trial judge held that petitioner is estopped to assert absence of consideration as a defense.

Nothing in Missouri statutes or decisions brought to our notice would warrant us in setting aside this ruling. A case decided in 1901, *Chicago Title & Trust Co.* v.

*Brady,* 165 Mo. 197, 65 S. W. 303, might have called for a different result. There an accommodation maker was held not estopped to assert absence of consideration as a defense against the bank's receiver, even though he had known that the note was part of a scheme to deceive the state banking authorities by swelling the apparent assets of the bank. But in 1920 the Missouri Supreme Court made it clear that the *Brady* decision can no longer be taken to represent the law of that state. Such is the purport of *Bank of Slater* v. *Union Station Bank,* 283 Mo. 308, 320, 222 S. W. 993, 996:

"The facts in this case inevitably suggest the question [of estoppel] we have discussed in this paragraph. Counsel for respondent, however, have not raised it—being deterred, doubtless, by the decision in Title & Trust Co. *v.* Brady, 165 Mo. 197, where a contrary doctrine is countenanced—and we therefore refrain from ruling upon the proposition. We have touched upon it, for the reason that if the Brady case, supra, is considered as announcing 'the Missouri rule' upon this topic, as some commentators have said, that rule is apparently in conflict with numerous and respectable authorities, and its soundness may admit of question."

No subsequent decision was cited, nor have we found any, to show that the court has since reverted to the doctrine of the *Brady* case. It cannot be said, therefore, that in holding petitioner estopped the trial judge departed from Missouri law.

There is no federal statute to override either the Missouri law as to estoppel or the Illinois law which treats respondent as a holder in due course. Were this Court, in the absence of federal legislation, to make its own choice of law, compare *United States* v. *Guaranty Trust Co.,* 293 U. S. 340; *O'Brien* v. *Western Union Telegraph Co.,* 113 F. 2d 539; and *Hinderlider* v. *La Plata Co.,* 304

U. S. 92, decided the same day as *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, Illinois or Missouri law would furnish the governing principles. See *Board of Comm'rs* v. *United States,* 308 U. S. 343; *Royal Indemnity Co.* v. *United States,* 313 U. S. 289, 296; *Just* v. *Chambers,* 312 U. S. 383, 387.

We are unable to find an estoppel created by federal statute. Reliance is placed upon *Deitrick* v. *Greaney,* 309 U. S. 190. But that case rested on a plain violation of an explicit provision of a federal statute in force at the time of its occurrence. This is not true here. An accommodation note deposited in a bank before an Act of Congress is on the books can hardly become a violation of the Act after it is passed merely because the note remains in the bank. One cannot violate a statute before it comes into being. Insofar as the statute may apply to arrangements whereby the Federal Deposit Insurance Corporation might have been misled to its detriment into insuring an insolvent bank, the record is barren of any indication that the $5,000 note in question had any relation to the bank's solvency or to the Corporation's undertaking as an insurer.

The Federal Deposit Insurance Corporation is bringing this suit as pledgee. As to the note sued upon, it is in no different position than would be any other pledgee. Indeed, from the business point of view, its position is less favorable. For it became pledgee only in 1938, three years after the note had been charged off on the books of the bank. The Corporation had since 1934 been making a regular annual examination of the bank's books, which showed this fact; and the schedule of collateral given to respondent when it became pledgee made it perfectly clear that the note had been charged off.

We are not concerned here with liability based on any doctrine of "equitable estoppel" evolved as a principle of

federal common law having no statutory roots. For we have put to one side, as unnecessary to the disposition of this case, the duty of this Court to make law "interstitially" (as Mr. Justice Holmes put it in *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, 221) in controversies arising in the federal courts outside their diversity jurisdiction.

Of course the policy expressed by the Federal Deposit Insurance Act might be violated, as the National Bank Act was violated in the *Deitrick* case, wholly apart from any question of estoppel or proof of loss to the Corporation. Our difficulty is that the statute cannot be stretched to fit this case. And it seems unnecessary to force such a result when a solution according to settled doctrines is available.

MR. JUSTICE JACKSON, concurring:

I think we should attempt a more explicit answer to the question whether federal or state law governs our decision in this sort of case than is found either in the opinion of the Court or in the concurring opinion of MR. JUSTICE FRANKFURTER. That question, as old as the federal judiciary, is met inescapably at the threshold of this case. It is the one which moved us to grant certiorari, and we could not resort to the rule announced without at least a tacit answer to it. The petitioner asserts that the decisions in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, and *Klaxon Co.* v. *Stentor Electric Mfg. Co.,* 313 U. S. 487, govern this case. If they do, we would not be free to disregard the law of Missouri and Illinois and to apply a doctrine of estoppel actually—but not avowedly—drawn from common-law sources to effectuate the policy we think implicit in federal statutes.

The Rules of Decision Act [1] provides that "the laws of the several States, except where the Constitution, treaties

---

[1] § 34 of the Judiciary Act of 1789, 28 U. S. C. § 725.

or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply." Whether "laws of the several States" as so used included non-statutory law embodied in judicial decisions of state courts was long a subject of controversy. After acting for half a century on the belief that it did, the Court in *Swift* v. *Tyson,* 16 Pet. 1, decided that it did not. Almost a century later that decision with its numerous and sorry progeny was overruled, and the Court answered that it did. *Erie R. Co.* v. *Tompkins, supra.* It later held that state decisions on conflicts of laws were also binding on the federal courts. *Klaxon Co.* v. *Stentor Mfg. Co., supra.* Thus, the Rules of Decision Act as now interpreted requires federal courts to use state law whether declared by the legislature or by the courts as rules of decision "in cases where they apply," except where federal law "shall otherwise require or provide." These recent cases, like *Swift* v. *Tyson* which evoked them, dealt only with the very special problems arising in diversity cases, where federal jurisdiction exists to provide nonresident parties an optional forum of assured impartiality.[2]

---

[2] "However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true, that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states." Chief Justice Marshall in *Bank of the United States* v. *Deveaux,* 5 Cranch 61, 87. See also, *Dodge* v. *Woolsey,* 18 How. 331, 354; *Burgess* v. *Seligman,* 107 U. S. 20, 34; *Lankford* v. *Platte Iron Works,* 235 U. S. 461, 478. But compare Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harvard Law Review 483.

The Court has not extended the doctrine of *Erie R. Co.* v. *Tompkins* beyond diversity cases.[3]

This case is not entertained by the federal courts because of diversity of citizenship. It is here because a federal agency brings the action, and the law of its being provides, with exceptions not important here, that: "All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States: . . ."[4] That this

---

[3] Its effect even in such cases seems not to have been definitely settled. In an equity case it was said that "the doctrine applies though the question of construction arises not in an action at law, but in a suit in equity." *Ruhlin* v. *New York Life Ins. Co.*, 304 U. S. 202, 205. That case was in the federal courts by reason of diversity jurisdiction. In a later case in which a suit in equity was brought in federal court to enforce liability under a federal statute the Court said: "The Rules of Decision Act does not apply to suits in equity. Section 34 of the Judiciary Act of 1789, 28 U. S. C. 725, directing that the 'laws of the several states' 'shall be regarded as rules of decision' in the courts of the United States, applies only to the rules of decision in 'trials at common law' in such courts, but applies as well to rules established by judicial decision in the states as those established by statute. . . . In the circumstances we have no occasion to consider the extent to which federal courts, in the exercise of the authority conferred upon them by Congress to administer equitable remedies, are bound to follow state statutes and decisions affecting those remedies." *Russell* v. *Todd*, 309 U. S. 280, 287, 294. In any event, the estoppel here involved seems no more an equity matter than the issue of good-faith purchase involved in *Cities Service Oil Co.* v. *Dunlap*, 308 U. S. 208, where state law was held to govern.

[4] Paragraph Fourth of 12 U. S. C. § 264 (j) empowers the Corporation "To sue and be sued, complain and defend, in any court of law or equity, State or Federal. All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States: *Provided*, That any such suit to which the Corporation is a party in its capacity as receiver

provision is not merely jurisdictional is suggested by the presence in the same section of the Act of the separate provision that the Corporation may sue and be sued "in any court of law or equity, State or Federal." [5]

Although by Congressional command this case is to be deemed one arising under the laws of the United States, no federal statute purports to define the Corporation's rights as a holder of the note in suit or the liability of the maker thereof. There arises, therefore, the question whether in deciding the case we are bound to apply the law of some particular state or whether, to put it bluntly, we may make our own law from materials found in common-law sources.

This issue has a long historical background of legal and political controversy as to the place of the common law in federal jurisprudence.[6]   As the matter now stands, it

of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders and such State bank under State law shall not be deemed to arise under the laws of the United States."

In a number of respects and with varying degrees of explicitness the Act elsewhere makes reference to state law. Specific federal criminal sanctions are provided.

[5] A similar provision without more is found in many federal statutes. E. g., 15 U. S. C. § 604 (Reconstruction Finance Corporation); 12 U. S. C. § 24 (National Banks); 12 U. S. C. § 341 (Federal Reserve Banks); 12 U. S. C. § 1432 (Federal Home Loan Banks); 12 U. S. C. § 1716 (c) (3) (National Mortgage Associations). This is not to suggest, however, that questions not specifically dealt with in these statutes cannot be federal questions simply because of the absence of an express provision that suits "shall be deemed to arise under the laws of the United States."

[6] Judicial opinions discussing various aspects of the question include: *Wheaton* v. *Peters*, 8 Pet. 591, 658 (1834); *Kendall* v. *United States*, 12 Pet. 524, 621 (1838); *Smith* v. *Alabama*, 124 U. S. 465, 478 (1888); *Bucher* v. *Cheshire R. Co.*, 125 U. S. 555, 583–584 (1888); Justice Field, dissenting in *Baltimore & Ohio R. Co.* v. *Baugh*, 149 U. S. 368, 394–395; Justices Holmes and Pitney, dissenting in *Southern Pacific Co.* v. *Jensen*,

seems settled that the federal courts may not resort to the common law to punish crimes not made punishable by Act of Congress;[7] and that, apart from special statutory or constitutional provision, they are not bound in other fields by English precedents existing at any particular date. The federal courts have no *general* common law, as in a sense they have no general or comprehensive jurisprudence of any kind, because many subjects of private law which bulk large in the traditional common law are ordinarily within the province of the states and not of the federal government. But this is not to say that wherever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may not resort to all of the source materials of the common law, or that when we have fashioned an answer it does not become a part of the federal non-statutory or common law.

I do not understand Justice Brandeis's statement in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 at 78, that "There is no federal general common law," to deny that the common law may in proper cases be an aid to, or the basis of, de-

---

244 U. S. 205, 221–222, 230. See also, George Wharton Pepper, The Border Land of Federal and State Decisions (1889); Frankfurter, Distribution of Judicial Power between United States and State Courts, 13 Cornell Law Quarterly 499; Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harvard Law Review 49; von Moschzisker, The Common Law and our Federal Jurisprudence, 74 University of Pennsylvania Law Review 109, 270, 367.

[7] The research of Charles Warren, leaned on heavily in *Erie R. Co.* v. *Tompkins* to discredit *Swift* v. *Tyson,* led that scholar to conclude that *United States* v. *Hudson,* 7 Cranch 32, and *United States* v. *Coolidge,* 1 Wheat. 415, establishing the above proposition, were probably wrongly decided. Warren, History of the Federal Judiciary Act of 1789, 37 Harvard Law Review 49, 73. The error, if it be one, comports, however, with the present tendency to constrict the jurisdiction of federal courts, and I think is likely to survive.

cision of federal questions. In its context it means to me only that federal courts may not apply their own notions of the common law at variance with applicable state decisions except "where the constitution, treaties, or statutes of the United States [so] require or provide." [8] Indeed, in a case decided on the same day as *Erie R. Co.* v. *Tompkins,* Justice Brandeis said that "whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the statutes nor the decisions of either State can be conclusive." *Hinderlider* v. *La Plata Co.,* 304 U. S. 92, 110.

Were we bereft of the common law, our federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the terms of the Constitution itself.

The contract clause, which prohibits a state from passing any "Law impairing the Obligation of Contracts," is an example of the part the common law must play in our system. This provision is meaningless unless we know what a contract is. The Constitution wisely refrains from saying. We have very recently held, upon a long line of authority, that in applying this clause we are not bound by the state's views as to whether there is a contract. *Irving Trust Co.* v. *Day,* 314 U. S. 556. Take the case where the question is whether a promise made without consideration comes within the protection of the contract clause. Is there any doubt as to where we must go for the answer that we do not find in the Constitution itself? This Court has not hesitated to read the com-

---

[8] Similarly, Mr. Justice Holmes's statement that there is no "transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute" was made with reference to "matters that are not governed by any law of the United States or by any statute of the State." See *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.,* 276 U. S. 518, 533.

mon-law doctrine of consideration into the contract clause, and to restrict the protection of that clause to promises supported by consideration. *Durkee* v. *Board of Liquidation*, 103 U. S. 646, 648; *Pearsall* v. *Great Northern Ry. Co.*, 161 U. S. 646, 667; *Grand Lodge* v. *New Orleans*, 166 U. S. 143, 146. Compare *Allegheny College* v. *National Chautauqua County Bank*, 246 N. Y. 369, 159 N. E. 173.

Other recognitions of our common-law powers abound in the Constitution.[9]

A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law

---

[9] Thus, the Judiciary Article provides that "the Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties" made under their authority. It does not give any definition of what are cases in law and equity; it simply assumes the existence of a jurisprudence from which the courts can ascertain the meaning of those terms.

Particularly in the clauses dealing with the rights of the individual, the Constitution uses words and phrases borrowed from the common law, meaningless without that background, and obviously meant to carry their common-law implications. Thus, we find in it the following: "convicted"; "Indictment"; "Treason, Felony, and Breach of the Peace"; "Piracies and Felonies"; "Privilege of the Writ of habeas Corpus"; "Bill of Attainder or ex post facto Law"; "Bribery"; "original Jurisdiction"; and "appellate Jurisdiction both as to Law and Fact." In the Bill of Rights Amendments, the necessity for resort to the common law for constitutional interpretation is even more obvious. Here we find: "unreasonable searches and seizures"; "Warrants"; "presentment or indictment of a Grand Jury"; "due process of law"; "right to a speedy and public trial by an impartial jury"; "in Suits at common law"; and "no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them.[10] Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in cases such as the present. *Board of Commissioners* v. *United States*, 308 U. S. 343, 350.

The law which we apply to this case consists of principles of established credit in jurisprudence, selected by us because they are appropriate to effectuate the policy of the governing Act. The Corporation was created and financed in part by the United States[11] to bolster the entire banking and credit structure. The Corporation did not simply step into the private shoes of local banks. The purposes sought to be accomplished by it can be accomplished only if it may rely on the integrity of banking statements and banking assets. In this case the Corporation attempted to realize on a note that was a part of the assets at the time it insured the bank. It is met by the plea that the note was a sham knowingly given to enable the bank to conceal the worthlessness of certain bonds which it had bought from the maker, a broker. This deception was not for the single day on which the note was delivered; its purpose and its effect were to

---

[10] For example, the common-law doctrines of conflict of laws worked out in a unitary system to deal with conflicts between domestic and truly foreign law may not apply unmodified in conflicts between the laws of states within our federal system which are affected by the full faith and credit or other relevant clause of the Constitution.

[11] 12 U. S. C. § 264 (d).

operate as a continuing inducement to existing creditors, and to those who might become creditors, to rely on this note as a $5,000 item counting towards its solvency. It may not have contemplated the then unborn Federal Deposit Insurance Corporation as the particular object of its deception, but its purpose was to conceal a loss from then unknown and unidentified persons who might be or become creditors or banking supervisors on behalf of the public. Under the Act, the Corporation has a dual relation of creditor or potential creditor and of supervising authority toward insured banks.[12] The immunity of such a corporation from schemes concocted by the coöperative deceit of bank officers and customers is not a question to be answered from considerations of geography. That a particular state happened to have the greatest connection, in the conflict of laws sense, with the making of the note involved, or that the subsequent conduct happened to be chiefly centered there, is not enough to make us subservient to the legislative policy or the judicial views of that state.[13]

I concur in the Court's holding because I think that the defense asserted is nowhere admissible against the Corporation and that we need not go to the law of any particular state as our authority for so holding.

I hardly suppose that Congress intended to set us com-

---

[12] 12 U. S. C. § 264 (i), (k), (l).

[13] Compare *Central Vermont Ry. Co.* v. *White*, 238 U. S. 507; *Southern Express Co.* v. *Byers*, 240 U. S. 612; *Chesapeake & Ohio Ry. Co.* v. *Kelley*, 241 U. S. 485; *Western Union Telegraph Co.* v. *Boegli*, 251 U. S. 315; *Western Union Telegraph Co.* v. *Esteve Bros. & Co.*, 256 U. S. 566; *Western Union Telegraph Co.* v. *Priester*, 276 U. S. 252; *Chesapeake & Ohio Ry. Co.* v. *Kuhn*, 284 U. S. 44; *Local Loan Co.* v. *Hunt*, 292 U. S. 234; *Jenkins* v. *Kurn*, 313 U. S. 256; *Royal Indemnity Co.* v. *United States*, 313 U. S. 289; *O'Brien* v. *Western Union Telegraph Co.*, 113 F. 2d 539.

pletely adrift from state law with regard to all questions as to which it has not provided a statutory answer. An intention to give persuasive or binding effect to state law has been found to exist in a number of cases similar in that they arose under a law of the United States but were not governed by any specific statutory provision.[14] No doubt many questions as to the liability of parties to commercial paper which comes into the hands of the Corporation will best be solved by applying the local law with reference to which the makers and the insured bank presumably contracted. The Corporation would succeed only to the rights which the bank itself acquired where ordinary and good-faith commercial transactions are involved. But petitioners' conduct here was not intended to confer any right on the bank itself, for as to it the note was agreed to be a nullity. Petitioners' conduct was intended to and did have a direct and independent effect on unknown third parties, among whom the Corporation now appears.[15] The policy of the federal Act does not seem

[14] *Campbell* v. *Haverhill,* 155 U. S. 610; *McClaine* v. *Rankin,* 197 U. S. 154; *Chattanooga Foundry* v. *Atlanta,* 203 U. S. 390; *O'Sullivan* v. *Felix,* 233 U. S. 318; *Seaboard Air Line Ry. Co.* v. *United States,* 261 U. S. 299; *Brown* v. *United States,* 263 U. S. 78; *United States* v. *Guaranty Trust Co.,* 293 U. S. 340; *Board of Commissioners* v. *United States,* 308 U. S. 343; *Rawlings* v. *Ray,* 312 U. S. 96; *Just* v. *Chambers,* 312 U. S. 383.

[15] The reasons given by the opinion of Mr. Justice Frankfurter for declining to apply the doctrine of equitable estoppel seem inadequate. To insist that the $5,000 note in question does not appear from the record to have had "any relation to the bank's insolvency or the Corporation's undertaking as insurer" is to part company with the realities of the period in question, when small banks—and large ones as well—were operating on perilously narrow margins of solvency, if any. To hold that the Corporation is to be judged as a mere private pledgee of a particular piece of paper is to ignore the comprehensive public character of its function. And the wrong to it was sustained when it be-

to me to leave dependent on local law the question whether one may plead his own scheme to deceive a bank's creditors and supervising authorities as against the Corporation. Even though federal criminal sanctions might not be applicable to these facts, and even though the doctrine of *Deitrick* v. *Greaney*, 309 U. S. 190, may not fully comprehend the present case, I think we now may borrow a doctrine of estoppel from the same source from which the Court borrowed it in that case, and to reach the same result.

came committed to insure the bank—not later when, as a step to working its way out of loss, it took assets already equitably its own as a pledge and put up money for a plan to continue banking facilities to the community. To say that the note had been charged off is to stress the irrelevant. This was, admittedly, long after the Corporation had become bound as the bank's insurer. It also attributes to the "charge-off" an unwarranted significance. The classification of this paper as inadmissible for a commercial bank would have been justified by its obvious "slow" character, or may have been due to mere lack of information as to the ability of a nonresident debtor to meet it. It is no acknowledgment or notice of a legal defect in the paper.