**In re Nicholas BOONE, Debtor.**

**Nicholas Boone, Plaintiff,**

**v.**

**Federal Deposit Insurance Corporation as receiver for Yankee Bank Savings and Loan, Defendant.**

**Bankruptcy No. 88–03864–W.**
**Adversary No. 97–80163–W.**

United States Bankruptcy Court,
D. South Carolina,
Columbia Division.

July 29, 1998.

**830**

Beattie B. Ashmore, Greenville, SC, for plaintiff.

Claude E. Hardin, Jr., Columbia, SC, for defendant.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court for trial upon the Debtor's complaint seek-ing to void the transfer of title to his residence to the Federal Deposit Insurance Corporation as receiver for Yankee Bank Savings and Loan ("FDIC") as being in violation of the automatic stay provisions of 11 U.S.C. § 362 and for actual and punitive damages for the FDIC's willful violation of the automatic stay[1]. After receiving the testimony, considering all the evidence and weighing the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]

## FINDINGS OF FACT

In 1988, the Debtor began to experience financial difficulties and fell behind in his payments to the FDIC as receiver for Yankee Bank Savings and Loan, which held the second mortgage on the Debtor's residence. The FDIC began foreclosure proceedings and a Decree of Foreclosure and Sale ("Foreclosure Decree") was entered by the Honorable G. Ross Anderson, Jr., United States District Judge on August 26, 1988. The Foreclosure Decree found that as of June 14, 1988, Nicholas Boone and his father Thomas Boone, a co-obligor who is now deceased, were indebted to the FDIC in the amount of $15,-565.36 with interest to accrue at 8.32% and directed the United States Marshal to sell the property at public sale after due notice. On November 10, 1988 and December 7, 1988,[3] the United States Marshal conducted the sale with the FDIC being the highest bidder with a bid of $14,-701.06.[4]

1. Further references to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* shall be by section number only.

2. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

3. The FDIC affirmatively sought a deficiency judgment, therefore, the bidding on the property remained open for an additional thirty (30) days.

4. There was no testimony and very limited evidence as to the status of the first mortgage following the filing of the United States Marshal's deed; however, it appears from the Defendant's Exhibit 5, a letter of August 16, 1996, that the Debtor continued to make pay-

On December 2, 1988, before the sale was final, the Debtor filed a Chapter 13 petition. The parties have stipulated that the FDIC was listed as a creditor of the estate and that notice of the Chapter 13 petition was properly sent and received by the FDIC. The schedules and statement of affairs filed by the Debtor on January 17, 1989 indicated that the residence had a value of $49,500 with liens of a first mortgage to First Federal Savings and Loan and a second mortgage to the FDIC which together totaled $31,851.92. Those schedules further indicated the regularly monthly payment to be $257.10 to First Federal and $178.36 to the FDIC. The Chapter 13 Plan which was filed on December 2, 1988 provided that the debt to First Federal was current and would remain current through payments made directly outside of the Plan beginning December 1988. The Plan also provided to cure the default under the FDIC mortgage by paying the arrearage to the FDIC, stated to be approximately $2,100.00, at $160 per month with 10% interest through the Plan, with regular monthly payments being made directly by the Debtor to that creditor beginning in January 1989. The Plan was to continue over thirty-six (36) months or until all debts to be paid through the Plan, including unsecured claims, were paid 100% from the payment of $200 per month paid to the Trustee. The Plan was confirmed by Order of February 9, 1989, without objection by the FDIC.

The Chapter 13 Trustee filed his Final Report and Accounting on June 28, 1990 indicating that all required payments had been complete including the payment of $2,388.02 principal and $164.93 interest to

the FDIC. The Debtor received his discharge on August 17, 1990.

On January 11, 1989, the FDIC filed a proof of claim in the Debtor's case which stated that it was owed $10,452.15 in "unpaid principal or unpaid amount of a judgment", plus $2,388 as an arrearage, for a total of $12,840.17, secured by a second mortgage on the Debtor's residence.

Attached to the claim was a computation sheet completed by agents of the FDIC which stated the following:

For loan Number # 5913–001254–01–1

| | |
|---|---|
| Principal balance | 8990.57 |
| Interest thru 12/1/88 | 2380.89 |
| Loan charge | 7.13 |
| Total | 11,378.59 |

(per diem interest $4.43)

Also shown is a loan # 5913–001253–00–1 which had a principal balance of $1,346.66 with interest due of $114.92, for a total payoff of $1,461.58 (per diem interest of 14¢).

In the Statement of Account attached to the FDIC's foreclosure complaint, the $1,346.66 amount was described as "Balloon payment pursuant to settlement agreement entered into by Yankee Bank for Finance and Savings, FSD and _____ through the South Carolina Department of Consumer Affairs" (settlement date September 18, 1986).[5]

Despite the filing of the Chapter 13 petition, on March 30, 1989, a United States Marshal's deed was filed conveying title to the Debtor's residence to the FDIC.[6] On that same day, a Release of Mortgage Liens by Foreclosure was also filed releasing the mortgage held by the FDIC. According to a recitation in the Marshal's deed, an Order was entered on

---

ments on the first mortgage at least through that date. The Foreclosure Decree does not address the first mortgage but the Debtor's Chapter 13 Plan reflected a first mortgage to First Federal of South Carolina and stated that payments were current. The evidence presented to the Court regarding the existence of the first mortgage and how it was affected by the occurrences cited herein was insufficient for the Court to address it.

5. There was no evidence submitted regarding any such settlement agreement or balloon payment.

6. There is no mention of the first mortgage in the deed.

February 27, 1989 which confirmed the sale and authorized the United States Marshal to execute the deed conveying the property. A copy of this Order was not presented to the Court as evidence.

The Debtor was not made aware of the filing of the United States Marshal's deed. His confirmed Chapter 13 Plan had provided for a cure of the mortgage default through payments to the FDIC. The Debtor made his Plan payments in full, the FDIC accepted the payments, and the Debtor received his discharge on April 17, 1990.[7]

The Debtor and the Debtor's wife testified that according to the Plan, they continued to make payments in the approximate amount of $178.00 per month directly to the FDIC as called for in the Debtor's Chapter 13 Plan through a date in 1994 at which time their payment was returned by the FDIC indicating to them that they had paid the mortgage in full.

On October 18, 1995, Oxford First Corporation sent a letter to the Debtor which indicated that Oxford had been servicing the Debtor's loan for the FDIC, and referenced loan # 182–030–00957, but that such servicing had been transferred to Suncoast Savings and Loan Association FSA.

On November 21, 1995, Loan Payment Division, a Division of Suncoast Savings and Loan, sent a letter to Nicholas Boone which in the reference section, referenced loan # 18203000957, changed the loan number to # 1026533, and indicated the transferred balance was $8990.57. The form letter merely advised that Suncoast was now servicing the loan and how to make payments and contact it.

Apparently a bill for final payoff was sent to the Debtor by Suncoast on December 25, 1995 referring to loan # 1001026533 with a principal balance (no interest or other charges indicated) of $8,990.57 with an 18% interest rate. How-

ever, the bill stated that the Debtor should call to find out the payoff amount.

On August 6, 1996, Suncoast sent a "special incentive offer" letter to the Debtor referring to loan # 1026533 and a principal balance of $8,990.57 which provided:

### WE'D LIKE YOU TO MAKE U.S. AN OFFER WE CAN'T REFUSE:

Suncoast Savings and Loan Association's Loan Payment division has been granted authority by the FDIC to accept a payoff on your loan at a discount of 25% to 40% of the **outstanding balance.** In addition, we may be able to waive ALL accrued interest and outstanding late fees. This offer is intended to resolve the above outstanding debt.

This offer will expire on *AUGUST 30, 1996,* so *PLEASE ACT IMMEDIATELY* to take advantage of this remarkable opportunity! Contact our office TODAY at 1–(800)–749–7869, extension 3 106, or (954)–963–2448, extension 3106. You may also fax us your offer at 1–(fax number).

Should you take advantage of and comply with our special incentive program, we will notify all national credit bureaus that your account has been *paid in full.*

If you decide to ignore this generous opportunity, and have not made payment arrangements with us, please note that we fully intend to assign a detrimental credit rating to those accounts that are severely delinquent and report this information to ALL credit reporting agencies. Our reporting will remain a permanent part of a borrower's credit file for at least seven years. Credit reports are carefully scrutinized when applying for credit or employment.

Please note that we are attempting to collect a debt and any information that we obtain will be used by us for that purpose.

---

7. The curing of the default is provided for in § 1322(b)(3) and eviscerates the Foreclosure

Order.

The Debtor did not discover the transfer of title to the FDIC until on or about September of 1995 when he attempted, but was unable, to refinance his home. The parties have stipulated that the Debtor, through his Chapter 13 bankruptcy attorney, Donald L. Pilzer, Esquire, notified the FDIC of its violation of the stay no later than September 6, 1995 and attempted to have the FDIC reconvey title back to the Debtor but that the FDIC refused. To address the situation, the Debtor was required to retain new bankruptcy counsel to have his bankruptcy case reopened and to prosecute the within adversary proceeding for willful violation of the automatic stay.

## CONCLUSIONS OF LAW

As initial matters, the Court notes that the FDIC has waived any claim to sovereign immunity by the filing of its proof of claim and failure to assert such a defense in this proceeding. *Anderson v. FDIC,* 918 F.2d 1139, 1143 (4th Cir.1990). Additionally the FDIC does not dispute that the transfer of title to the Debtor's residence was void as being in violation of § 362. Therefore, on June 2, 1998, this Court issued an Order voiding *ab initio* the transfer as to the Debtor by Marshal's deed. The remaining stipulated issues are whether the violation of the automatic stay by the FDIC was willful, and if so, for a determination of damages, and whether the Debtor is still indebted to the FDIC.

The FDIC takes the position that its violation of § 362 was a technical violation, not a willful violation, and that the reason the FDIC did not transfer title back to the Debtor was because it is still owed a debt and its mortgage has been released as a result of the foreclosure proceeding. The Debtor takes the position that any mortgage default was cured through the Chapter 13 Plan since the arrearage was fully paid with interest (which the FDIC does not dispute) and the remaining indebtedness was paid in full during the years following the Debtor's discharge, therefore the FDIC has no interest in or a claim against the property.

Section 362(a) provides in part as follows:

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtor that was or could have been commencement of the case under this title, or to recover a claim against the Debtor that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C. § 362(a). Section 362(h) provides that any individual injured by a willful violation of the automatic stay shall recover actual damages, including costs and attorneys fees, and if appropriate, punitive damages. The burden is upon the Debtor to prove a willful violation of the automatic stay by clear and convincing evidence. *In re Ard,* 95–70839–D, C–95–8051 (Bkrtcy.D.S.C. 3/5/96).

The FDIC has admitted that the post-petition transfer of title was in violation of the automatic stay provisions of § 362(a) and the terms of the confirmed Plan. It is clear that the transfer should not have occurred and that the FDIC participated in the sale post-petition by its bidding, receipt of the deed, and further, took no steps to address or remedy the situation despite being clearly advised of the problems in 1995. The Court must first determine whether these actions were willful so as to give rise to damages pursuant to § 362(h).

The term "willful" has been defined as follows by several courts: A "willful violation" does not require specific intent to

violate the automatic stay. Rather the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. *In re Bloom,* 875 F.2d 224 (9th Cir.1989); *In re INSLAW, Inc.,* 83 B.R. 89 (Bankr.D.D.C.1988); *In re [Mewes],* 58 B.R. 124 (Bankr.D.S.D. 1986); *In re Tel–A–Communications Consultants, Inc.,* 50 B.R. 250 (Bankr. D.Conn.1985). Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded. *In re Bloom, supra; In re INSLAW, Inc., supra; In re AM International, Inc.,* 46 B.R. 566 (Bankr.M.D.Tenn.1985).

*In re Clarkson,* 168 B.R. 93 (Bkrtcy.D.S.C. 1994). Courts have also found that a post-petition retention of property in which a Chapter 13 Debtor has an interest is a violation of the automatic stay. *In re Bunch,* 119 B.R. 77 (Bkrtcy.D.S.C.1990). *Also see In re McMahon,* 129 F.3d 93 (2d Cir.1997) and *In re LaTempa,* 58 B.R. 538 (Bkrtcy.W.D.Va.1986).

■ At trial, the FDIC offered no sufficient explanation or excuse to justify its participation in the post-petition sale of the residence. While the FDIC takes the position that its actions were simply a technical or "unwitting" violation of the stay since it never actually dispossessed the Debtor and his family, the evidence shows that the FDIC's actions themselves were intentional and at a time when it knew of the bankruptcy. The FDIC's participation in the process of selling the property, its retention of title to the Debtor's residence while it knew about, and in fact participated in, the Debtor's Chapter 13 case, and its interference with the revesting of the property with the Debtor after the default was cured, constitutes a willful violation of

the automatic stay under these circumstances.[8] Additionally, even if the Court were to speculate that the close timing of these events and the FDIC's large bureaucratic nature contributed to its actions, there is no excuse for the FDIC to accept the Plan payments from the Chapter 13 Trustee (which cured the default) and the principal payments directly from the Debtor, yet still fail to void the transfer of title or at least to seek some other remedy, especially after being contacted by the attorney for the Debtor. The FDIC did not demonstrate any efforts at all to respond to the correspondence from the Debtor's attorney dating back to 1995. Therefore, the Court finds that the actions of the FDIC were a willful violation of the automatic stay.

At trial, counsel for the FDIC argued that the FDIC is still due the amount set forth by the District Court in the original Foreclosure Decree, with interest accruing at either 8.32% or the 18% original rate, with a credit being given only for the Chapter 13 arrearage payments made by the Trustee. However, the FDIC presented no witnesses or other competent evidence of the current balance of the account and had no record to dispute the Debtor's evidence or to indicate whether any payments had or had not been received from the Debtor.

The only credible evidence related to any remaining indebtedness to the FDIC was the testimony of the Debtor and his wife that they continued to make the regular monthly payments in the approximate amount of $178.00 per month directly to the FDIC as required by the confirmed Chapter 13 Plan up until at least August 4, 1993 when the FDIC sent a letter to the Debtor offering to settle the remainder of the debt for a "reasonable discount" and inviting a telephone call to it to "resolve this obligation".[9] Ms. Boone testified that

---

8. The issues raised herein may also raise analogous issues regarding a violation of the discharge injunction pursuant to § 524.

9. This letter referred to the loan # 5913–002696911 and did not reference any specific balance due.

she called the FDIC's credit specialist as requested in that letter, who informed her that the balance was then $1,346.66, but that they would allow her to settle the debt for a lump sum payment of $1,000.00. Ms. Boone made contemporaneous written notes of that conversation with the FDIC's agent on the same letter sent to the Debtor by the FDIC.

 During the trial, the FDIC objected to the introduction of the August 4, 1993 letter from the FDIC and any testimony from Ms. Boone about the balance of the debt based upon the *D'Oench Duhme* doctrine.[10] The *D'Oench Duhme* common law doctrine, which in essence has been codified by 12 U.S.C. § 1823(e), basically states that "[n]o agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it ... as receiver of any insured depository institution, shall be valid against the corporation unless such agreement (A) is in writing, ...". *D'Oench, Duhme & Co., v. F.D.I.C.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).[11]

> Congress substantially codified the elements of the common-law *D'Oench* doctrine in order to protect taxpayers, depositors, and creditors of failed financial institutions. *Allen,* 16 F.3d at 574. The statute provides in pertinent part:
>
> > No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it ... as receiver of any insured depository institution [ ] shall be valid against the [FDIC] unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C)

was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been, continuously, from the time of its execution, an official record of the depository institution.

> 12 U.S.C.A. § 1823(e)(1). A plaintiff must satisfy all four requirements before it can enforce an agreement against the FDIC. *Allen,* 16 F.3d at 574.

*Young v. F.D.I.C.,* 103 F.3d 1180 (4th Cir. 1997). In this Court's view, neither the *D'Oench Duhme* common law doctrine nor the statute are applicable in this case for two reasons. First, the *D'Oench Duhme* common law doctrine and statute do not apply when the party entering into the agreement with a debtor is not the bank in receivership or its officers or agents, but is the FDIC itself. The policy behind *D'Oench Duhme* is to prevent the assertion of defenses which are based on subsequent oral agreements that modify or change the original terms of an agreement and is to protect the FDIC from such undocumented agreements between the obligor and the failed bank, not between the obligor and the FDIC itself and its own agents. To view the doctrine or statute otherwise would be to allow the FDIC to act with impunity regardless of its own representations or conduct in collecting debts.

The *D'Oench* doctrine, as first articulated by the Supreme Court, protects the FDIC by barring defenses that arise from "secret agreements" made by banking institutions and debtors. See *D'Oench, Duhme & Co., Inc., v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench,* the FDIC demand-

---

10. Because the FDIC had not advised the Court in the Joint Pretrial Order of this objection, the Court took the objection to introduction of the letter and the testimony under advisement. Based upon the reasoning stated within, the *D'Oench Duhme* doctrine is not applicable and the Court will overrule the FDIC's objection and allow the testimony and the letter into evidence.

11. Further references to the *D'Oench Duhme* doctrine shall refer to the common law doctrine as well as 12 U.S.C.A. § 1823(e)(1).

ed payment on a note it acquired in a purchase and assumption transaction of a failed bank. *Id.* at 454, 62 S.Ct. at 677. The debtor refused to pay based on a secret side agreement with the bank that the note would not be called for payment. *Id.* The Court held that the Federal Reserve Act reflected a federal policy to protect the FDIC from misrepresentations or misstatements as to the genuineness of the securities in a portfolio of a bank of which it insures. *Id.* at 457, 62 S.Ct. at 679. In order to protect the important federal policy, the Supreme Court created a federal common law rule that bars defenses against claims by the FDIC. *Id.*

*Ledo Financial Corp. v. Summers,* 122 F.3d 825 (9th Cir.1997). *Also see Federal Financial Co. v. Hall,* 108 F.3d 46 (4th Cir.1997).

The *D'Oench* doctrine, first described by the United States Supreme Court in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), "prohibits claims based upon agreements which are not properly reflected in the official books or records of a failed bank or thrift." *Resolution Trust Corp. v. Allen,* 16 F.3d 568, 574 (4th Cir.1994). The doctrine serves two purposes. First, it allows federal and state examiners to rely on a bank's records in evaluating the institution's fiscal soundness. *Id.* at 574. Second, it "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Langley v. FDIC,* 484 U.S. 86, 92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).

*Young v. F.D.I.C.,* 103 F.3d 1180 (4th Cir. 1997). Here there is no disputed indebtedness based upon agreements made by the Debtor and Yankee Bank or its predecessors, the evidence in question relates to the agreements and acts of payment as between the Debtor and the FDIC itself or its servicing agents.

Secondly, the effect of the *D'Oench Duhme* doctrine is that a party's defense of payment fails as a matter of law where there are no written documents to contradict the final bank balance indicated on the failed bank's records. The dispute here is whether the FDIC itself gave credit to the Debtor and his wife for payments made since the Foreclosure Decree.

The FDIC presented no competent evidence as to the present balance remaining, if any, on its claim. The testimony of Mr. and Ms. Boone, which this Court finds credible, does not contradict the balance on the debt indicated by the records of Yankee Bank. Instead it is the *only* evidence presented that payments have been made since the foreclosure by the FDIC to reduce or satisfy the indebtedness. The note and mortgage in this case between the Debtor and the FDIC have not been challenged. There are no allegations of collusion or secret side agreements. The Debtor and his wife simply testified that they continued to make mortgage payments outside the Plan until the balance of the debt should have been paid and the FDIC refused to take any more payments. For all of these reasons, the Court will overrule the FDIC's objection to the introduction of the August 4, 1989 letter with notes and the testimony of Ms. Boone based upon the *D'Oench Duhme* doctrine.

In this case, the facts which stretch over a period of nearly 10 years are elusive. The record reflects multiple loan numbers and servicing agents used by the FDIC. The August 4, 1993 letter from the FDIC and August 6, 1996 letter from Suncoast Savings and Loan clearly demonstrated an offer to discount old loans such as this one and to reduce the balance due and waive all accrued interest and late fees. Ms. Boone testified that the balance of the debt as reported to her by the FDIC in August of 1993 was $1,346.66. She also testified that she was not in a financial position to accept the $1,000 settlement

offer so she continued to make the regular monthly payments for about another year until the FDIC returned a check at which time she understood that the debt had been paid in full.

Considering the totality of the circumstances existing in this case, the Court finds that the FDIC should be equitably estopped from asserting that a debt is still owed by the Debtor.

Equitable estoppel "arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990). Reliance on the misrepresentation is reasonable only if the party asserting estoppel does not or should not know the truth. *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59–60 n. 10, 104 S.Ct. 2218, 2223–24 n. 10, 81 L.Ed.2d 42 (1984) ("If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."); see also *Cannon v. Group Health Service of Oklahoma, Inc.*, 77 F.3d 1270, 1276–77 (10th Cir.1996) (listing common law elements of equitable estoppel).

*Bakery and Confectionery Union v. Ralph's Grocery Co.*, 118 F.3d 1018 (4th Cir.1997). The FDIC is subject to a claim of equitable estoppel when it acts to collect a debt. *FDIC v. Harrison*, 735 F.2d 408 (11th Cir.1984).[12] Either the Boones have paid all of their debt to the FDIC or they reasonably relied to their detriment on the misleading representations made by the FDIC in August of 1993. Considering the repeated transfer of the account to multiple servicing agents, the FDIC's lack of recognition of payments, and because the FDIC itself had offered discounts and incentives to settle the debt, the Boones could reasonably rely upon the payoff cited to them by the FDIC.[13] In addition, the proof of claim filed by the FDIC in the Debtor's bankruptcy case provided a debt, excluding the arrearage to be paid through the Plan, of $10,452.15. If the Debtor paid $178.36, the regular payment as indicated by the Debtor's schedules and statement of affairs, from January 1989 through August of 1994, the total paid would be $12,-128.48, a sum greater than the amount claimed. Therefore, the Court additionally finds that FDIC should be judicially estopped from asserting an indebtedness more than that reflected by its proof of claim. Therefore the Court finds no justification for the FDIC's actions.

Having found that the FDIC willfully violated the automatic stay pursuant to § 362(h), the Court must find the appropriate damages.

As stated previously, when the FDIC refused to reconvey title back to the Debtor, he was forced to hire an attorney. Despite numerous letters from the Debtor's attorney, the FDIC either chose not to remedy the situation or to ignore the Debtor's plight. These actions resulted in the Debtor having to hire a new attorney to file a motion to reopen his bankruptcy case and to file this adversary proceeding. These costs incurred by the Debtor could have been avoided if the FDIC would have transferred the title back to the Debtor after receipt of Mr. Pilzer's letters in 1995

**12.** Any remaining claim asserted by FDIC against the Debtor may also be setoff pursuant to § 106.

**13.** While upon examination the payoff amount represented by the FDIC appears to be the same amount denominated as the "balloon payment" part of the debt shown on the foreclosure pleadings, it must be remembered that this amount was given to the Boones by the FDIC nearly 5 years after the Boones would have any reason to examine the foreclosure papers or proof of claim to realize the similarity of the two amounts.

or otherwise sought a remedy from this or the District Court. The Debtor testified that as a result of the FDIC's violation of the automatic stay, he suffered monetary damages including the loss of 100 to 200 hours of time from work at $15.00 per hour and incurred to that point, approximately $4,000.00 in legal fees in having to hire Mr. Pilzer as well as his current bankruptcy counsel to file and prosecute the within adversary proceeding.[14] The Debtor and his wife also testified to the emotional harm which the actions of the FDIC have inflicted on their family and on their personal relationship. In this respect, the Court views the actions of the FDIC in this case as egregious. With admitted knowledge of the bankruptcy, the FDIC's actions violated the automatic stay and it continued the effects of that violation for nearly ten (10) years. It has stonewalled the Debtor and his wife from resolving this problem as only a large governmental bureaucracy can. Its actions have left the Debtor's family in personal as well as financial upheaval. They have been unable to view their home as theirs, unable to refinance it to improve their lifestyle, unable to spend monies to repair or improve the home or otherwise on their children in fear of further action by the FDIC, all without a single effort by the FDIC to remedy the wrong that took place. Despite the Court's encouragement, the FDIC indicated that this matter could not be resolved short of this Order. Considering the totality of the circumstances, the Court sets damages for emotional distress at $5,000. Therefore, the Court finds that the Debtor has proven actual damages in the amount of $11,250.00.[15]

Section 362(h) also provides that in "appropriate circumstances" punitive damages may be awarded. However, while the is-

sue was not raised by counsel for the FDIC, it appears that § 106 may preclude an award of punitive damages in this instance and therefore the Court declines to award such at this time. *See In re Thomas*, 184 B.R. 237 (Bkrtcy.M.D.N.C.1995).

## CONCLUSION

For the reasons stated within, it is therefore,

**ORDERED,** that the Federal Deposit Insurance Corporation as receiver for Yankee Bank Savings and Loan willfully violated the automatic stay of 11 U.S.C. § 362 and pursuant to 11 U.S.C. § 362(h), the Debtor is entitled to actual damages in the amount of $11,250.00.

**AND IT IS SO ORDERED.**

---

14. The Debtor also testified to a loss of $2,500.00 from the loss of his homestead exemption but did not qualify how this loss was incurred. The evidence before the Court is confusing regarding who paid property taxes on the residence for the years from 1988 to the present. The Debtor's testimony implied that they paid the taxes on the home.

15. The Court reserves jurisdiction to adjust damages in the event the Debtor incurs further attorneys fees, costs and other damages in the event FDIC does not comply with this Order or the Order of June 2, 1998.