**SAVERS FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff,**

Resolution Trust Corporation, as Conservator for Savers Savings Association, Plaintiff–Appellee,

R.F.S. Management Company of Alabama, Inc., Receiver,

Aircoa Hospitality Services, Inc., Intervenor,

v.

**AMBERLEY HUNTSVILLE, LTD.,** Amberley Decatur Joint Venture, Amberley Associates, Warner E. Stone, Defendants–Appellants,

Joe R. Faulk, G.N. Olson, Donald E. Redford, Defendants.

**SAVERS FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff,**

Resolution Trust Corporation, as Conservator for Savers Savings Association, Plaintiff–Appellee,

RFS Management Company of Alabama, Inc., Receiver,

v.

**AMBERLEY DECATUR, LTD.,** Amberley Decatur Joint Venture, Amberley Associates, Warner E. Stone, Defendants–Appellants,

Joe R. Faulk, Jr., Gerald Nels Olson, Donald E. Redford, Defendants.

Nos. 90–7307, 90–7308.

United States Court of Appeals, Eleventh Circuit.

June 28, 1991.

**1202**

William L. Chenault, III, Chenault, Hammond and Hall, Decatur, Ala., for defendants-appellants.

James T. Baxter, III, Berry, Ables, Tatum, Little & Baxter, P.C., Huntsville, Ala., for plaintiff-appellee.

Antony S. Burt, Nancy T. Beggs, Katherine T. Millett, Hopkins & Sutter, Chicago, Ill., J. Scott Watson, F.D.I.C., Appellate Litigation, Washington, D.C., for Resolution Trust Corp. and Savers Federal.

Before ANDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

ANDERSON, Circuit Judge:

This is an appeal of two related cases [1] in which the district court granted summary judgment in favor of the Resolution Trust Corporation ("RTC"), which is acting as conservator for Savers Savings Association ("Savers"), and against appellants Amberley Huntsville Joint Venture ("Joint Venture"), Amberley Huntsville, Ltd. ("Limited"), Amberley Associates ("Associates"), and Warner E. Stone ("Stone"). Appellants contend that the summary judgment should be vacated because there remain issues of material fact regarding their respective liabilities on two promissory notes and the accompanying guaranties. We affirm the district court's judgments in favor of RTC but modify the amounts of the judgments and remand only the issue of the amount due under the Huntsville Guaranty.

## I.  STATEMENT OF FACTS

This appeal involves two promissory notes, each of which is accompanied by a guaranty, executed by appellants in favor of Savers Federal Savings and Loan Association ("Savers Federal"), the predecessor in interest to the RTC.

1.  *The Huntsville Note and Guaranty*

On or about November 10, 1983, Joint Venture executed a Note ("Huntsville Note") in which it promised, among other things, to repay to Savers Federal the principal sum of $7,840,000, or so much of the principal as was actually disbursed, plus other amounts required by the note. The Huntsville Note was nonrecourse. It limited Joint Venture's liability to the assets that Joint Venture had pledged as security for the note and expressly provided that Savers Federal could not seek to enforce

---

**1.**  These cases, docket numbers 90–7307 and 90–7308, were not consolidated by the district court or by this court on appeal.  However, they were scheduled and argued together before this court. We order that the cases are hereby consolidated.

the debt against assets not specifically pledged as security.[2] The note expressly provided that Savers Federal was not entitled to recover a deficiency judgment against Joint Venture if the foreclosure and sale of the pledged assets failed to cover the amount due.[3] The principal collateral for the note was an improved parcel of real property on which Joint Venture had constructed and was operating a hotel ("mortgaged property").

In addition to the terms regarding payment of principal and interest, the Huntsville Note stated that Joint Venture promised to pay certain other amounts to Savers Federal as "additional interest." This provision addressed two contingencies. If Joint Venture sold the mortgaged property prior to maturity of the note, the note required Joint Venture to pay Savers Federal fifteen percent of the "Net Sales Proceeds" as "additional interest."[4] If Joint Venture repaid its obligations in full at maturity or prior to maturity, the note required Joint Venture to pay Savers Federal fifteen percent of the "Fair Market Value" of Savers Federal's "additional interest."[5]

As part of the same transaction, Warner E. Stone, Joe R. Faulk, Jr., Gerald N. Olson and Donald E. Redford, as individuals, executed a Guaranty in which they promised to repay a portion of the amount due under the note if Joint Venture defaulted. For purposes of this appeal, the Guaranty required the guarantors to pay Savers Federal the amount "by which the outstanding principal balance of the Note exceeds $5,880,000."[6]

**2.** The Huntsville Note provided:

> The Maker shall be liable upon the indebtedness under this Note, all sums to accrue or become payable thereon ... to the extent, but only to the extent, of the security pledged for the payment of this Note, including without limitation, all property, rights and estates described in the Mortgage and Security Agreement, Loan Agreement, and other Security Documents.

In addition, the Huntsville Note provided that Savers' legal rights were

> limited to the preservation, enforcement and foreclosure of liens, rights, properties and estates in the Mortgage and Security Agreement and Security Documents now or at any time hereafter securing the payment of the indebtedness evidenced by this Note and no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of the Maker or its Joint Venturers or Partners of Joint Venturers except in their capacity as Guarantors, other than the properties, rights, estates, and interests described in the Mortgage and Security Agreement and Security Document securing the indebtedness evidenced by this Note.

**3.** The Huntsville Note expressly precluded Savers from obtaining a deficiency judgment against its makers:

> In the event of foreclosure of such liens, rights, properties and estates in the Mortgage and Security Agreement and the Security Documents securing the payment of the indebtedness evidenced by this Note by private power of sale or otherwise, no judgment for any deficiency upon such indebtedness, sums and amounts shall be obtainable by the Payee or other holder hereof against the Maker hereof, individually, or his heirs, successors, assigns, legal representatives, or Joint Venturers

and/or Partners of Joint Venturers of Maker except in their capacity as Guarantors.

**4.** The exact language of this provision is as follows:

> Upon the sale of the Mortgaged Property, refinance or maturity of the loan, whichever first occurs and in addition to other costs and fees required to be paid under the Security Instruments (hereinafter defined) and subject to any applicable usury limitations, Maker promises to pay to the order of Payee, as "Additional Interest" the following sums: (1) Fifteen Percent (15%) of the "Net Sales Proceeds" from the sale of the Mortgaged Property hereinafter defined and more particularly described in the Mortgage and Security Agreement of even date herewith, securing the loan evidenced by this Promissory Note, and; (2) an amount equal to Fifteen Percent (15%) of the difference between the appraised value of the Mortgaged Property according to the appraisal approved by Payee ...

**5.** With respect to the makers' obligations at maturity or early retirement of the debt, the Huntsville Note provided as follows:

> In the event Maker does not sell the Mortgaged Property but repays the loan prior to maturity or at maturity, Maker shall pay to Payee for its Additional Interest and in lieu thereof the Fair Market Value of Payee's Additional Interest.

**6.** The provision of the Huntsville Guaranty that defines the amount recoverable from the guarantors provides as follows:

> The term "Guaranteed Indebtedness" shall mean all sums stated to be payable under the terms of the Note ... including, without limitation, each and every installment of principal and/or interest under said Note ...; provid-

### 2. *The Decatur Note and Guaranty*

On or about July 22, 1985, Joint Venture executed another Note ("Decatur Note") in favor of Savers Federal, promising to pay the principal sum of $5,750,000, or so much of the principal as was actually disbursed, and other amounts required by the terms of the note. The terms of the Decatur Note were quite similar to those of the Huntsville Note but varied in certain details. Like the first note, the Decatur Note was nonrecourse, providing that Savers "shall not seek a personal deficiency judgment against the [Joint Venture] but will pursue any deficiency judgment against the guarantors of the indebtedness...." R1.24.40. The Decatur Note also contained a provision similar to the "additional interest" provision in the Huntsville Note. The Decatur Note granted Savers an "Equity Share" which required Joint Venture to pay Savers fifteen percent of the "Net Sales Proceeds" of the mortgaged property if it was sold during the "Construction Phase" of the loan or twenty-five percent of the proceeds if the mortgaged property was sold during the "Permanent Phase" of the loan.[7] The Decatur Note also provided that if Joint Venture paid its obligations at or before maturity, Joint Venture had to pay Savers fifteen percent of the "Fair Market Value of the Mortgaged Property," but if Joint Venture failed to pay its obli-

gations at maturity, it had to pay Savers twenty-five percent of the fair market value of the property.[8] Finally, the four guarantors of the Huntsville Note also executed a guaranty of Joint Venture's obligations under the Decatur Note on or about July 22, 1985.

## II. COURSE OF PROCEEDINGS

On November 16, 1988, Savers Federal filed suit in Alabama state court alleging that Joint Venture had defaulted on both notes. Savers Federal alleged that it was entitled to recover judgment and to foreclose on the mortgaged properties pursuant to the respective Mortgage and Security Agreement for each note. Savers Federal sought to recover the outstanding principal, interest, and other costs associated with the loans as well as all expenditures related to the actions of foreclosure. Savers Federal also alleged that Faulk, Olson, Redford and Stone would be liable under the guaranties for any deficiencies resulting from the foreclosure actions.

The defendants answered and alleged as affirmative defenses that the "additional interest" provision had created a partnership in fact between Savers Federal and the defendants and that Savers Federal had breached its fiduciary duties arising from

---

ed, however, on and after the Limitation Date (as hereinafter defined) the Guaranteed Indebtedness shall only include, if any, the amount of the principal balance of the Note from time to time outstanding by which the *unpaid principal balance of the Note exceeds $5,880,000.00.*

Thus, the "Guaranteed Indebtedness" initially included the entire amount borrowed by the makers of the Huntsville Note but was reduced following the "Limitation Date" as defined in the guaranty. The parties agree that the "Limitation Date" has passed and that in this appeal, the amount due under the guaranty is defined by the last sentence of the above provision: "the amount of the principal balance of the Note from time to time outstanding by which the unpaid principal balance of the Note exceeds $5,880,000." For a more complete discussion of this issue, see text *infra* at 19–21.

7. The Decatur Note provides as follows:

In addition to the payment of principal and interest provided to be paid herein ... Maker [the Joint Venture] promises to pay to the order of [Savers], as an "Equity Share", Fif-

teen percent (15%) of the "Net Sales Proceeds" upon the sale of the Mortgaged Property more particularly described in the Exhibit "A" attached hereto and made a part hereof, if the sale of the Mortgaged Property occurs during the Construction Phase of the Loan or Twenty-five percent (25%) of the "Net Sales Proceeds" upon the sale of the Mortgaged Property more particularly described in Exhibit "A", if said sale occurs during the Permanent Phase of the Loan ...

8. The Decatur Note further provides as follows:

If the Mortgaged Property is not sold prior to the maturity date of the Loan, at maturity [Savers] is to receive an amount equal to Twenty-five percent (25%) of the Fair Market Value of the Mortgaged Property ...

If [the Joint Venture] repays in full the principal and interest of the Loan ... [the Joint Venture] must purchase [Savers'] "Equity Share" for Fifteen percent (15%) of the Fair Market Value of the Mortgaged Property.

that partnership. Specifically, defendants alleged that Savers Federal misled them into believing that it had restructured the loan when in fact, it had not. Defendants also alleged that Savers Federal violated its duty of good faith and fair dealing under the Uniform Commercial Code.

On February 10, 1989, the Federal Home Loan Bank Board appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") to serve as conservator for Savers Federal. FSLIC removed the case to federal court under 28 U.S.C.A. § 1331 (Supp.1990) and 12 U.S.C.A. §§ 1730(k)(1)(B) & (C) (1989). On August 9, 1989, the Resolution Trust Corporation ("RTC") succeeded FSLIC as conservator for Savers Federal upon the enactment of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). *See* 12 U.S.C.A. § 1441a(b)(3) (1989). Subsequently, the Office of Thrift Supervision placed Savers Federal into receivership and appointed RTC as receiver. All of the assets of Savers Federal were then transferred to Savers Savings Association ("Savers") with RTC remaining as Savers' conservator. The liabilities of the former Savers Federal remained with RTC in its capacity as receiver for Savers, and the district court entered an order substituting RTC for Savers Federal as the proper plaintiff.

On May 30, 1989, Joint Venture, Limited and Associates filed for protection under Chapter 11 of the Bankruptcy Code. The district court issued an order lifting the automatic stay of proceedings under the Code and permitting this case to go forward against Joint Venture, Limited and Associates. Guarantors Faulk, Olson and Redford also filed bankruptcy and currently remain under the protection of the Bankruptcy Code's automatic stay provision. Guarantor Stone did not file for bankruptcy protection.

On January 23, 1990, RTC filed motions for summary judgment on each note and guaranty. In each motion, RTC sought a judgment on the relevant note and foreclosure of the accompanying mortgage against Joint Venture, Limited and Associates. Pursuant to the terms of the notes, RTC did not seek deficiency judgments against Joint Venture, Limited and Associates. Instead, RTC sought a deficiency judgment against guarantor Stone, the only guarantor not under bankruptcy protection, under the terms of both guaranties. In support of each motion for summary judgment, RTC attached an affidavit from Knighten Starnes, the asset manager at RTC responsible for both the Huntsville and Decatur Notes. Starnes testified that under the Huntsville Note, the "arrearage" was $8,034,386.38 and the total outstanding balance was $10,125,694.95, and that under the Decatur Note, the "arrearage" was $5,796,791.19 and the total amount due was $7,495,665.19.[9]

To oppose the motions for summary judgment, appellants submitted the affidavit of Stone, a general partner in Joint Venture and one of the guarantors of both notes. Stone testified that Savers had assumed an equity interest in the property beyond that of a mere creditor, that Joint Venture had turned management of the properties over to a third-party in reliance upon promises by Savers, that Savers had agreed to accept cash flow payments rather the regular payments specified in the notes, and that Savers had breached the above promises by enforcing the original terms of the notes.[10] With respect to the Huntsville Note, Stone also testified that a condition precedent had occurred under the terms of the guaranty that limited his liability. R1–45–11.

On February 28, 1990, the district court entered summary judgment in favor of RTC on both notes and both guaranties.

---

**9.** In the affidavit, Starnes defined "arrearage" to include both the principal amount owed on the loan as well as any accrued and unpaid interest. The total amount due reflects the "arrearage" plus the amount due under the "additional interest" and "equity" provisions of the Huntsville and Decatur Notes, respectively.

**10.** Stone also testified that Savers failed to credit Joint Venture's cash flow payments against the balance due and improperly added late fees and delinquent interest to the amount due.

On the Huntsville Note, the district court entered judgment in the amount of $8,034,-386.38 against Joint Venture, Limited, Associate, Olson Redford and Stone. The judgment also named as a debtor Joe R. Faulk, who had had some dealings with Savers and was the father of one of the defendants, Joe R. Faulk, Jr., but was not actually a party to the case. On the Decatur Note, the court awarded $5,796,791.19 against the same parties.

All parties realized immediately that the summary judgment contained errors. RTC moved to alter or amend the summary judgment and filed a proposed summary judgment order for each note. Under the Huntsville Note, RTC ask for a judgment of $10,125,694.95 against no specified person or entity, the right to foreclose, and a judgment against Stone, in his capacity as guarantor, in the amount of $4,245,694.95. The proposed summary judgment order for the Decatur Note was identical but sought $7,495,665.19 under the note, foreclosure, and $1,873,916.97 under Stone's guaranty. In its proposed judgments, RTC did not seek deficiency judgments against Joint Venture, Associates or Limited and did not seek any judgment against Faulk, Olson or Redford, all of whom remained under bankruptcy protection.

On March 22, 1990, the district court substantially adopted RTC's proposed summary judgment orders, including the amounts due, but entered the judgments against Joint Venture, Limited, Associates and Stone rather than against no persons or entities in particular. Following the entry of the amended orders of summary judgment, appellants filed a Motion for Reconsideration or, in the Alternative, to Alter or Amend Order and Judgment. R1.47. The district court denied this motion on April 6, 1990.

## III. DISCUSSION

### A. The Huntsville and Decatur Notes

1. *Liability Under the Huntsville and Decatur Notes*

   Appellants contend that the Huntsville and Decatur Notes created a partnership between themselves and Savers, giving rise to a mutual fiduciary duty. Appellants argue that Savers' efforts to obtain foreclosures in order to collect on the notes violated Savers' fiduciary duty to appellants under the partnership arrangement. To the extent that this argument is based upon any collateral or side agreements, written or unwritten, between appellants and Savers, it is barred by the *D'Oench Duhme* doctrine and 12 U.S.C.A. § 1823(e) (1989). In *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that when the Federal Deposit Insurance Corporation ("FDIC") assumes control of a bank and attempts to enforce a note under the terms on its face, the borrower against whom the note is enforced cannot assert as a defense a collateral written agreement by the bank not to collect on the note. The Court held that permitting such collateral agreements to frustrate the collection of bank loans by the FDIC would completely destroy the ability of the FDIC to assess the solvency of lending institutions. *Id.* 62 S.Ct. at 679–81. When examining a bank, the FDIC would not be able to evaluate its strength from the bank's records because it could not identify which loans were subject to non-collection agreements and which were enforceable. *Id.* As a result of this decision, the principle of prohibiting the enforcement of agreements not appearing in bank records against federal regulatory agencies has become known as the *D'Oench Duhme* doctrine.

Congress codified *D'Oench Duhme* the doctrine at 12 U.S.C.A. § 1823(e) (1989). This statute precludes enforcement against the FDIC of any "agreement" that is adverse to the interests of the FDIC unless the agreement is in writing, was executed by the relevant parties at the same time as the loan, is approved in the minutes of the lender's board of directors or appropriate loan committee, and has continuously appeared in the lender's official records of the loan.[11] The Supreme Court recently inter-

---

**11.** Section 1823(e) provides as follows:

No agreement which tends to diminish or

preted § 1823(e) broadly in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). There, the Court affirmed a summary judgment against defaulted borrowers who alleged that the FDIC should not be able to enforce a note and mortgage agreement because the lender had fraudulently misrepresented the acreage of the mortgaged property, the acreage within that property containing minerals, and the presence of preexisting mineral rights leases. *Id.* 108 S.Ct. at 400. Even though the alleged misrepresentations were not recorded anywhere in the loan documents, the borrowers contended that *D'Oench Duhme* should not bar the defense of misrepresentation because the conduct of the bank was fraudulent and the FDIC knew of the allegations of fraud when it assumed control of the loan. *Id.* 108 S.Ct. at 401–02. The Supreme Court held that § 1823(e) did bar the defense of misrepresentation, concluding that the term "agreement" in the statute was not limited to express promises by a bank to perform some obligation in the future. The Court reasoned that in order for § 1823(e) to serve Congress' stated purpose of preserving the ability of the FDIC to regulate depository institutions, the term "agreement" must encompass not only written collateral agreements but any unwritten or unrecorded agreements as well, including fraudulent misrepresentations by the bank. The Court also held that neither the fraudulent nature of the alleged misrepresentation nor the FDIC's prior knowledge of the allegations of fraud affected the operation of § 1823(e).

From the above discussion, we are convinced that the *D'Oench Duhme* doctrine and § 1823(e) bar appellants from asserting any defense or argument based upon any collateral written or unwritten agreement

that was not part of the initial transaction and does not appear in the bank's records of the Huntsville or Decatur Notes. Therefore, any arguments relating to the duties owed by the parties or to the existence of a partnership must be based on the terms appearing on the faces of the loan documents.

■ Appellants argue that the Huntsville and Decatur Notes created a partnership between themselves and Savers under Alabama law. The Alabama Code defines a partnership as an "association of two or more persons to carry on as co-owners a business for profit." Ala.Code § 10–8–2(7) (1975). The Huntsville and Decatur Notes each contain a provision which requires appellants to pay to Savers at the termination of the loan a lump sum equal to a specified percentage of the value of the mortgaged property. Appellants argue that these provisions give Savers a "beneficial interest" in the mortgaged properties and therefore indicate that Savers and appellants are co-owners of the properties within the meaning of Ala.Code § 10–8–2(7). Appellants also argue that because Savers agreed to accept as payment a percentage of the value of the mortgaged property, Savers agreed to accept "a share of the profits" for purposes of Ala.Code § 10–8–20(4) (1975), which provides that "[r]eceipt by a person of a share of the profits of a business is prima facie evidence that he is partner in the business ..." Based on these statutes and the terms of the notes, appellants assert that Savers entered into a partnership.

■ Appellants' argument fails for a number of reasons. Most obviously, there are no partnership agreements between the parties and there is no language in the loan documents of either the Huntsville Note or the Decatur Note indicating or referring to

defeat the interests of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor,

contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution.

the existence of a partnership. Significantly, the Decatur Note contains an express disclaimer of any "partnership, joint venture or association" between Savers and appellants.[12] In addition, appellants' argument that Alabama law implies a partnership from the terms of repayment is misplaced. The presumption of partnership only applies when two persons or entities share the "profits" of a venture. The payments required by the two notes in the instant case were not from the "profits" of Joint Venture. The payments were due only upon events that terminated the mortgage, and the loan documents did not require appellants to pay any of their operating revenue to the bank beyond the scheduled repayment of principal and interest. Even if the payments had been from Joint Venture's profits, appellants' argument still fails. The presumption that a recipient of a share of the profits of a venture is a partner in the venture does not apply when the profits are received "[a]s interest or other payment on a loan, though the amount of payment varies with the profits of the business...." Ala.Code § 10–8–20(4)d. (1975). Both the Huntsville and Decatur Notes are clear that the provisions which entitle Savers to a lump sum payment at the termination of the loan were intended as payments on the loans, not as Savers' share of the profits earned by appellants. Indeed, the provision in the Huntsville Note refers to the lump sum payment as "additional interest." The fact that the amount of the lump sum payment varies according to the appreciated value of the mortgaged property does not create a presumption of partnership, as is evident

from Ala.Code § 10–8–20(4)d.'s express language "though the amount of the payment varies with the profits of the business." Finally, the lump sum payment provisions did not place any risk of loss on Savers. Under Alabama law, a significant factor "in determining whether a partnership relationship exists is the existence of a legally binding obligation to share in the losses of the business." *Adderhold v. Adderhold*, 426 So.2d 457 (Ala.Civ.App.1983). In each note, appellants alone bore the risk of loss. The Huntsville Note requires appellants to repay the loan in full, regardless of whether their business makes a profit, expressly including a lump sum payment equal to twenty percent of the value of the mortgaged property in the event of default. Both notes also provide that if at any time the outstanding loan balance exceeds eighty percent of the fair market value of the mortgaged property, appellants must provide either a new appraisal or pay down the loan balance.[13] Thus, each note contains specific provisions that protect Savers from potential losses due to depreciation or insufficient appreciation of the mortgaged properties and provide Savers with express rights if appellants are unable to pay. Neither of these provisions places any risk of loss on Savers. For the several reasons stated above, we find that neither the Huntsville Note nor the Decatur Note created a partnership between appellants and Savers.

■ In addition, we find that Savers owed no duty of good faith to appellants in exercising its rights under the acceleration provisions of the respective notes. Appel-

12. Paragraph 11.20 of the Decatur Mortgage and Security Agreement provides as follows:
11.20 *No Partnership:* Nothing contained in the Security Documents is intended to, or shall be construed as, creating to any extent and in any manner whatsoever any partnership, joint venture or association between Mortgagor, any Guarantor, Mortgagee, or in any way make Mortgagee co-principals with Mortgagor or any Guarantor with reference to the Mortgaged Property, and any inferences to the contrary are hereby expressly negated.

13. The Huntsville Note contains the following provision:
Notwithstanding the foregoing and in no event shall the outstanding principal balance

of this Note exceed Eighty percent (80%) of the Fair Market Value of the Mortgaged Property (according to the latest appraisal furnished by Borrower) during the Construction Phase of this Loan or Eighty-five Percent (85%) of such Fair Market Value of the Mortgaged Property during the Permanent Phase of this Loan. In the event the outstanding principal balance exceeds the required percentage of Fair Market Value then Borrower shall either furnish a new appraisal showing an increased Fair Market Value or pay the excess of the principal amount to the Payee hereof upon written request.

lants contend that Savers owed them a duty of good faith and fair dealing under the Alabama Commercial Code and Alabama common law and breached that duty by exercising its right to accelerate the loan. More precisely, appellants argue that Savers agreed to accept cash flow payments in lieu of the scheduled payments of principal and interest to help appellants avoid default while short on cash. Appellants assert that Savers, after accepting a number of cash flow payments, nevertheless accelerated the entire amount due under the notes with full knowledge that appellants could not pay because they had been paying Savers all of their available cash reserve in the form of the cash flow payments. There is no evidence in the bank records of either the Huntsville or Decatur loan that Savers agreed to accept cash flow payments instead of the scheduled payments of principal and interest. Consequently, appellants cannot rely upon the existence of such an agreement to create a duty of good faith. *See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); 12 U.S.C.A. § 1823(e).

With respect to the Alabama Commercial Code, Savers acted within the statutory definition of "good faith" in the context of loan acceleration. Ala.Code § 7–1–208 (1984) provides that a party possessing the power of acceleration "shall have the power to do so only if he in good faith believes that the prospect of payment is impaired."[14] There is no dispute that appellants could not make the scheduled payments under either note at the time they were due. Under these facts, Savers' acceleration of the loan was completely within the bounds of good faith as defined in Ala.Code § 7–1–208.

### 2. *Amount Due Under the Huntsville and Decatur Notes*

■ Having concluded that Savers had no fiduciary duty or duty of good faith to appellants, we affirm the district court's summary judgment of liability on the Huntsville Note and the Decatur Note. We agree with appellants, however, that the district court's order must be modified to reflect the nonrecourse nature of these notes. With respect to the Huntsville Note, the district court entered judgment against Joint Venture, Associates and Warner E. Stone in the amount of $10,125,-694.95 plus the costs of the action and reasonable attorneys' fees. This order directs Joint Venture, Associates and Stone to pay $10,125,694.95, the entire amount due under the note. However, the note expressly provides that the liability of its signatories is limited to the value of the assets pledged as security:

> The Maker shall be liable upon the indebtedness under this Note, all sums to accrue or become payable thereon ... *to the extent, but only to the extent, of the security pledged for the payment of this Note,* including without limitation all property rights and estates described in the Mortgage and Security Agreement, Loan Agreement, and other Security Documents.

R1.1.70 (emphasis added). The note further provides that the legal action available to Savers against the makers in the event of default is limited to the preservation, enforcement and foreclosure of the liens pledged as security for the note, expressly forbidding Savers from seeking to recover assets of the makers not pledged as security for the note or under the accompanying guaranty. R1.1.70. Finally, the note specifically precludes Savers from obtaining a deficiency judgment against the makers, except in their capacity as guarantors. R1.1.65. From the foregoing provisions, we are convinced that Savers' remedies under the note are limited to foreclosure upon

---

**14.** Ala.Code § 7–1–208 provides in full as follows:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

the assets pledged as security thereto. Thus, we affirm the district court's judgment of foreclosure. However, we modify the district court's order to eliminate any recovery against Joint Venture, Associates or Stone [15] of any amount above and beyond the value derived from the assets pledged as security under the note and its accompanying security agreements.

The same is true for the Decatur Note. The district court entered summary judgment under this note against Joint Venture, Limited, Associates and Warner E. Stone in the amount of $7,495,665.19. This order included a judgment of foreclosure in favor of RTC under the Mortgage and Security Agreement that permitted the clerk of the court to sell the foreclosed property at public auction. We find that the provisions of the Decatur Note clearly limit the liability of the makers to the value of the pledged collateral:

> It is understood and agreed that in any proceedings for the enforcement of the indebtedness secured hereby, the Payee shall not seek a personal deficiency judgment against Maker, but will pursue any deficiency judgment against the guarantors of the indebtedness.

Therefore, although we affirm the district court's order permitting the foreclosure and public sale of the property pledged as security for the note by the makers, we modify the district court's order to eliminate any recovery against Joint Venture, Associates, Limited or Stone of any amount above and beyond the collateral.[16]

**B.  The Huntsville and Decatur Guaranties**

█ Appellant Stone does not dispute that he is bound to pay RTC under the terms of the Huntsville and Decatur guaranties.[17] The only remaining issue is the amount of Stone's liability. The district court entered summary judgment against Stone under the Decatur Guaranty in the amount of $1,873,916.97. The parties do not dispute the amount of this judgment, which is thus affirmed.

With respect to the Huntsville Guaranty, however, Stone asserts that the district court erred in calculating the amount of his liability. The provision of the Huntsville Guaranty that defines the amount recoverable from Stone provides as follows:

> The term "Guaranteed Indebtedness" shall mean all sums stated to be payable under the terms of the Note ... including, without limitation, each and every installment of principal and/or interest under said Note ...; *provided, however, on and after the Limitation Date (as hereinafter defined) the Guaranteed Indebtedness shall only include, if any, the amount of the principal balance of the Note from time to time outstanding by which the unpaid principal balance of the Note exceeds $5,880,000.00.*

(emphasis added). The "Limitation Date" has passed and thus the amount due under the guaranty is governed by the highlighted portion of the text of the guaranty. The parties dispute, however, the amount guaranteed by this provision.

Stone contends that his liability under the Huntsville Guaranty is limited to the

---

**15.** The Huntsville Note provides that its limitation on recovery from the makers of the note does not in any way limit Savers' ability to pursue deficiency judgments against the guarantors:

> Notwithstanding anything herein contained to the contrary, this paragraph shall not mitigate, void, effect or satisfy in any manner the obligations of the Guarantors under that certain Guaranty Agreement of even date herewith executed by Joe R. Faulk, Jr., G.N. Olson, Donald E. Redford and Warner E. Stone.

Our holding with respect to the Huntsville Note does not affect the liability of the guarantors under the terms of the Huntsville Guaranty.

**16.** The Decatur Note provides that the limitation on recovery from the makers of the note does

not in any way limit Savers' ability to pursue deficiency judgments against the guarantors:

> Notwithstanding anything herein contained to the contrary, this paragraph shall not mitigate, void, effect or satisfy in any manner the obligations of the Guarantors under their Guaranty of even date herewith executed by Joe R. Faulk, Jr., Gerald Nels Olson, Donald E. Redford and Warner E. Stone.

Our holding with respect to the Decatur Note does not affect the liability of the guarantors under the terms of the Decatur Guaranty.

**17.** The automatic stay of proceedings under the Bankruptcy Code remains in effect as to the other guarantors of these notes: Gerald N. Olson, Donald E. Redford and Joe R. Faulk, Jr.

amount by which the outstanding principal on the loan exceeds $5,880,000.00. Stone urges that the "outstanding ... principal balance" includes only principal and does not include accrued interest.

RTC argues that the guaranty requires Stone to pay the difference between $5,880,000.00 and the total amount outstanding under the Huntsville Note, including both unpaid principal and accrued interest. RTC asserts that there was an unlimited guaranty of principal and interest, and then after a certain date the guaranty of principal was limited to the excess over $5,880,000.00, leaving the guaranty of accrued interest unlimited.

This issue was fairly presented to the district court, but was not addressed. We decline to address it now, preferring that the district court do so in the first instance. Accordingly, the judgment against Stone on the guaranty is vacated and this issue is remanded to the district court for adjudication.[18]

## IV. CONCLUSION

For the foregoing reasons, the judgment against Amberley Huntsville Joint Venture, Amberley Huntsville Associates, and Warner E. Stone on the Huntsville Note is affirmed. The judgment against Amberley Decatur Joint Venture, Amberley Decatur, Ltd., Amberley Huntsville Associates and Warner E. Stone on the Decatur Note is also affirmed. However, the judgment is modified to reflect the nonrecourse nature of the loans by limiting the liability to the value of the assets pledged as security for the loans. We also affirm the district court's summary judgment in the amount of $1,873,916.97 against Warner E. Stone on the Decatur Guaranty. With respect to the Huntsville Guaranty, we vacate the judgment against Warner E. Stone and re-

mand to the district court for adjudication of the amount due.

For the foregoing reasons, the district court's judgment is

AFFIRMED in part, MODIFIED in part, VACATED in part, and REMANDED in part.

---

18. Stone contends that the affidavit supporting RTC's motion for summary judgment against Stone on the guaranty was conclusory and did not provide component figures and calculations. This argument may have merit. On remand, if summary judgment is proper with respect to the amount due under the Huntsville Guaranty, more detailed affidavits may be required to establish the exact amounts of principal, accrued

interest, and other payments overdue under the Huntsville Note.

Stone also argues that the RTC affidavit failed to consider disputes between the parties regarding proper credit of past payments against the indebtedness. Stone's allegations regarding the proper credit of past payments are conclusory and without merit.