**EAGLE ADMIXTURES, LTD.,**
a Colorado corporation,
**Plaintiff–Appellant,**

v.

**Robert HANNON, doing business as World's Greatest Company,
Defendant–Appellee.**

No. 92CA0892.

Colorado Court of Appeals,
Div. III.

July 15, 1993.

Caplan & Earnest, J. Marcus Painter, Richard E. Bump, Boulder, for plaintiff-appellant.

Bostrom & Sands, P.C., Jon F. Sands, Denver, for defendant-appellee.

Opinion by Judge ROTHENBERG.

In this forcible entry and detainer action, plaintiff, Eagle Admixtures, Ltd. (landlord), appeals from the judgment entered upon a jury verdict in favor of defendant, Robert Hannon (tenant). Landlord also appeals the trial court's award of attorney fees. We reverse the judgment, vacate the order awarding attorney fees, and remand for new trial.

Tenant is president of World's Greatest Co., which operates amusement rides at Heritage Square, an entertainment complex located in Golden, Colorado. In November 1979, tenant talked to Virginians–Heritage Square Co. (Virginians), which then owned and operated Heritage Square, about entering into a lease. Tenant did not produce an original lease, but introduced into evidence a copy of a lease which had been signed by him. Authorship of the lease was disputed, and although the signature of Virginians does not appear on the lease, there was oral evidence of a signed, but unrecorded, document.

According to tenant's evidence, the lease which was drafted allowed tenant to operate amusement rides there. The lease was for an initial five-year period with an addendum giving tenant a renewal option of five years, plus one additional year for each investment over $10,000 made by tenant with the approval of Heritage Square owners or management.

In May 1981, Virginians conveyed ownership of Heritage Square to K.A.M. Development Corporation. In order to purchase the property, K.A.M. obtained financing from Silverado Savings & Loan Association. The property was security for the Silverado loan.

Approximately five years later, K.A.M. conveyed ownership of Heritage Square to Johnson Homes, Inc. In 1987, when Johnson Homes failed to make the required payments, Silverado foreclosed on the property and became its owner. During these changes in ownership from Virginians to K.A.M. Development to Silverado, tenant remained on the property.

In 1990, Silverado failed. The Federal Savings & Loan Insurance Corporation (FSLIC) was appointed receiver until FSLIC was succeeded in this capacity by the Federal Deposit Insurance Corporation (FDIC).

In February 1990, the FDIC notified tenant that his lease had expired in May 1989 and, therefore, that he was a month-to-month tenant.

In January 1991, FDIC sold Heritage Square to landlord, and in March of the same year, landlord served tenant with notice of termination of the tenancy. Landlord claimed tenant had a month-to-month tenancy. Tenant disagreed that he was a month-to-month tenant and contended that, because he had previously made approximately $150,000 worth of improvements at Heritage Square, under the terms of the lease, his tenancy had been extended for an additional 15 years from May 1989. Accordingly, tenant refused to vacate the property.

Thereafter, landlord filed this unlawful detainer action, demanding possession of the property, damages, costs, and attorney fees. At the close of the evidence, the jury returned a verdict in favor of tenant, thereby denying landlord possession of the property. Although inherent in its verdict was the conclusion that the tenant occupied the property pursuant to the lease in question, the jury

was not asked to determine the exact length of tenant's lease. Landlord now appeals.

## I.

■ Landlord's first contention is that the trial court should have applied the holding in *D'Oench, Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and refused to admit the unsigned lease and addendum to the lease. We agree with the trial court that *D'Oench* is inapplicable here.

In *D'Oench, supra,* the maker of a note was estopped from asserting as a defense against the FDIC the fact that the maker had an alleged oral agreement with the lender that excused payment. The United States Supreme Court's decision was based upon federal policy which is to protect the FDIC from misrepresentations regarding the genuineness or integrity of securities held by the banks it insured. *See Reisig v. Resolution Trust Corp.,* 806 P.2d 397 (Colo.App.1991) (*D'Oench* doctrine barred plaintiff from asserting defense to promissory note based upon alleged verbal representations made by bank's loan officer). *See generally* Galves, *FDIC and RTC Special Powers In Failed Bank Litigation,* 22 Colo.Law. 473 (March 1993).

Thus, the *D'Oench* doctrine, now codified as 12 U.S.C. § 1823(e) (1988), protects federal banking authorities and their successors from all claims and defenses based upon secret or unrecorded side agreements that alter terms of facially unqualified obligations, whether or not these claims or defenses might otherwise be permitted.

Here, however, contrary to landlord's contention, the tenant's defense was not based upon a secret, verbal side agreement. Rather, tenant presented evidence that he entered into a written lease with Virginians, his original landlord. We have found no authority for the proposition that tenant's inability to produce the original lease signed by both parties converts this into a situation governed by *D'Oench.* Accordingly, we conclude the trial court did not err in failing to exclude tenant's evidence of the lease and addendum to the lease.

Tenant also asserts that the *D'Oench* doctrine is inapplicable because it was not raised by either the FSLIC or the FDIC and that both federal agencies had acknowledged the existence of the lease during ownership of the property. However, in view of our conclusion that *D'Oench* does not apply to these facts, we need not address that contention.

## II.

■ Landlord next contends that, under the subordination clause of tenant's lease, all of tenant's rights were extinguished when Silverado foreclosed on the property in 1987. We agree.

The subordination agreement in defendant's 1979 lease expressly subordinates tenant's interest in the property to any existing or future deed of trust. It states:

> This lease and all of the rights of Tenant hereunder, at Landlord's option, shall be subject and subordinate to ... the lien of any mortgages or deeds of trust in any amount or amounts whatsoever ... without the necessity of the execution and delivery of any further instruments on the part of Tenant to affect such subordination.

At least one Colorado decision has addressed a tenant's contractual obligations to a new purchaser after foreclosure. *See White v. Short,* 794 P.2d 1110 (Colo.App. 1990) (contractual obligations assumed by tenant are enforceable by purchaser at foreclosure; subordination clause not involved).

However, no Colorado decision has addressed the precise issue of whether a subordination clause causes a tenant's right to his leasehold interest in the property to be terminated upon foreclosure, if the lessee has received the requisite notice of foreclosure and has failed to exercise his rights of redemption. *See* § 38–39–106, C.R.S. (1982 Repl.Vol. 16A) and § 38–38–104, C.R.S. (1992 Cum.Supp.) (lessee is considered a lienor under redemption statute and is entitled to cure default). *See also* § 38–37–113(2), C.R.S. (1982 Repl.Vol. 16A) (notice of election and demand for sale required "to each person who appears to have acquired a *record interest* in said real estate subsequent to the

recording of said trust deed...." (emphasis added)); § 38–39–102(5) (notice of right to redeem required to persons "only if their interest in the real estate being foreclosed was established by an instrument *recorded* ...."); *S.L.K. Testamentary Trust v. Davids*, 728 P.2d 1259 (Colo.1986). *But see* Colo.Sess.Laws 1990, ch. 275, § 38–38–101(7)(a) at 1654 (Effective October 1, 1990, foreclosing party wishing to extinguish a leasehold pursuant to an unrecorded lease required to provide notice of foreclosure to the lessee); § 38–38–101(7)(a), C.R.S. (1992 Cum.Supp.).

In *Dover Mobile Estates v. Fiber Form Products, Inc.*, 270 Cal.Rptr. 183, 186, 220 Cal.App.3d 1494, 1498 (1990), the California Court of Appeals held that a lease which is subordinate to a deed of trust is automatically extinguished by a foreclosure sale. The court reasoned that this rule of law "comports with basic notions of priorities and notice." *Accord 220 West 42 Associates v. Ronbet Newmark Co.*, 53 A.D.2d 829, 385 N.Y.S.2d 304 (1976) (lease subordinate to existing and future mortgages and thus extinguished by foreclosure sale). *Cf. Fidelity Bond & Mortgage Co. v. Paul*, 90 Colo. 94, 6 P.2d 462 (1931) (lease terminates upon foreclosure sale).

Here, at the time Silverado foreclosed upon Johnson's deed of trust in 1987, tenant's lease was not recorded, and the statute merely required notice to recorded interests. *Cf.* § 38–38–101(7)(a), C.R.S. (1992 Cum. Supp.) (requiring notice to holders of unrecorded leaseholds). And, although tenant's unrecorded lease gave him a statutory right of redemption, he failed to exercise that right.

Accordingly, applying the reasoning in *Dover*, we conclude that tenant's unrecorded lease was extinguished as a matter of law by the foreclosure sale and by tenant's subsequent failure to exercise his right to redemption. Concomitantly, all of tenant's rights and obligations under that 1979 lease also were terminated.

■ This, however, does not end the inquiry because, as the court also noted in *Dover*:

Even though the lease is extinguished, the tenant and purchaser are not precluded from entering into a new lease agreement.

*Dover Mobile Estates v. Fiber Form Products, Inc.*, 270 Cal.Rptr. at 187, 220 Cal.App. 3d at 1500. *See also Peterson v. NCNB Texas National Bank*, 838 S.W.2d 263 (Tex. Ct.App.1992) (when lease is executed after recording of deed of trust, sale under foreclosure gives purchaser right to terminate lease or continue it with tenant's consent).

This ancillary rule simply allows a tenant to prove that the new purchaser entered into a *new* lease agreement after the original lease agreement has been terminated following foreclosure.

Here, tenant presented evidence that after the foreclosure, the new purchaser and its successors treated the lease as if it were in full effect after the foreclosure. According to tenant, the landlord attempted to terminate tenant's rights on the expiration date contained in the lease, rather than on the foreclosure date. Thus, tenant's evidence showed that Silverado and its successors either recognized the original lease or entered into a new lease agreement with the tenant. *See Dover Mobile Estates v. Fiber Form Products, Inc., supra.*

The jury, however, returned merely a general verdict. Thus, despite the fact that tenant's evidence suggested the existence of such a new agreement, we are unable to determine whether that evidence was the basis of the verdict. The record does not include any special interrogatories, nor does it even include the jury instructions. Accordingly, we conclude the tenant is entitled to a new trial, but only on the issues of whether there existed a new lease agreement after the foreclosure and, if so, whether there was a breach of that agreement and damages arising therefrom.

In view of our conclusions, the award of attorney fees made to tenant also cannot stand.

The judgment is reversed, the order for attorney fees is vacated, and the cause is

remanded for a new trial in accordance with the views expressed in this opinion.

CRISWELL, J., concurs.

NEY, J., specially concurs in part and dissents in part.

Judge NEY specially concurring in part and dissenting in part.

I agree with the majority that the judgment entered cannot stand. However, I write separately because I believe that the proper reasons for reversal should be other than those upon which the majority bases its result.

Further, I would remand for an entry of judgment for plaintiff rather than for a new trial.

## I.

I do not agree that the subordination clause of tenant's lease automatically extinguished all of tenant's rights when Silverado foreclosed the property in 1987. Rather, I believe that the terms of the lease terminate the tenant's rights only at the option of the landlord.

Here, the undisputed facts demonstrate that, after foreclosure, Silverado, the succeeding federal banking authorities, and landlord all treated the lease as in full effect until its stated expiration date. There was no demonstrated reliance upon the foreclosure as basis for termination of tenant's rights.

The reasoning adopted by the majority in part II of its opinion would, as a matter of law, automatically terminate a tenant's rights and obligations after foreclosure. This I believe is contrary to the express terms of the lease which specifically provide:

> This lease and all of the rights of Tenant hereunder, *at Landlord's option,* shall be subject and subordinate to ... the lien of any mortgages.... (emphasis added)

Therefore, I would conclude that the plain language of the lease expressly permits landlord to hold tenant to its terms, and the record reveals that landlord did so. Furthermore, it is particularly inequitable to permit landlord to rely upon the terms of the lease and obligations thus imposed upon tenant until, because of changed market conditions, it wishes to terminate the lease. *Cf. White v. Short,* 794 P.2d 1110 (Colo.App. 1990).

Consequently, under the situation here in which landlord held tenant to the lease, I would conclude that landlord did not exercise its option to subordinate the lease to the lien created by the mortgage.

## II.

Because I conclude that the lease continued in effect until its termination in 1989, it is necessary to consider tenant's claim that, by his actions, he became entitled to an extension of his tenancy beyond the 1989 termination.

In order to extend the lease beyond 1989, the evidence must show expenditures by tenant for specific purposes, i.e., investment or rides, and for definite amounts, i.e., $10,000 for each year's extension. In addition, these expenditures must have been *approved by owners or management.*

In evaluating the sufficiency of the evidence which supports a jury verdict, an appellate court must view it in the light most favorable to the prevailing party, here the tenant, and also must give to that party the benefit of all reasonable inferences therefrom. *Furnary v. Merritt,* 837 P.2d 192 (Colo.App.1991).

Evidence offered by tenant consists of a recapitulation of claimed expenditures during the period 1979–1987 based upon a depreciation schedule prepared by tenant's accountant in 1988. Supporting documents for the depreciation schedule consisted of tax returns and some receipts and cancelled checks. This document showing the recapitulation, along with a letter from tenant expressing his opinion that the lease had thereby been extended, was sent to the manager of the square in 1988. The manager at that time forwarded the information to Silverado. Silverado never responded to this request for approval of the expenditures made during the previous nine-year period. Further, tenant relies upon the physical presence of the

enumerated amusement rides and improvements at the lease site to prove his compliance.

Viewing this evidence in the light most favorable to tenant, I would accept his claim to have made the required monetary investments, and, thus, would next consider whether these investments were made with the requisite approval of owners or management.

Evidence in support of this necessary component to qualify for the extensions sought consists of testimony by tenant that owners and managers were aware of his actions and did not protest, disapprove, or prevent them. In addition, the manager of the property from 1985 to 1987, stated that she remembered certain improvements or additions made by tenant; that to the best of her knowledge, the actions "would have been approved"; and that tenant would not have been able to make the improvements he did without approval.

In contrast, the owner of Virginians testified that he had never accepted the lease, was never asked to grant approval of any improvements or rides established by tenant, and considered tenant's expenditures to be limited to ordinary upkeep or construction and improvement of portable buildings. The manager at the time of Virginians' ownership likewise stated that he did not receive requests for approval from tenant for expenditures. The tenant does not dispute that he never requested specific approvals for specific expenditures until 1988, more than one year after the last claimed expenditure was made.

When the property passed to K.A.M., there were at least two managers, the first of whom stated that he did not receive any application from tenant for permission to install a ride. The second manager, who managed the property from 1985 to 1987, continued the testimony cited previously by stating that she did not make any agreements with tenants and "did not even see leases of tenants." She further stated: "As far as improvements on things that [tenant] did do ... I'm sure that that went through ownership." [Question] "Not through you?" [Answer] "No."

The owner of K.A.M. testified that he would have been consulted with respect to any major extension, that he would have had to approve any such extension, and that any such extension "would have gone through attorneys, and it would have been a fully documented procedure." This owner further stated that while the property manager possibly could have verbally approved certain actions, any such action which extended or modified the lease would "definitely" have been documented and recorded. It was K.A.M.'s position that money expended by tenant during its ownership was not for investment but was for "getting up to normal standards of both visual and safety."

Evidence was also offered by a representative of Silverado concerning the property after Silverado's acquisition in 1987. He testified that tenant had never furnished to Silverado figures showing expenditures for proposed new rides or improvements, that tenant had never requested a lease extension, and that tenant had never discussed with Silverado what type expenditure would qualify for a lease extension.

In summary, tenant seeks recognition that he expended over $150,000 on "investment and rides" during the period 1979–1989 which he believed was with approval of management or owners. However, even if it were to be assumed, arguendo, that the implied approval upon which tenant relies was actually given, such would be insufficient to comport with the terms of the lease. There is no evidence in the record which references approval to any definite amounts of expenditure related to specific extension of the lease.

Therefore, even when viewed in the light most favorable to tenant, there is no competent evidence to support his claim for extension of the lease based upon approved expenditures. And, when a jury's verdict is clearly erroneous in light of the law and facts, that verdict cannot stand. *Rine v. Isham*, 152 Colo. 411, 382 P.2d 535 (1963).

Thus, I conclude that, even if tenant is correct in his assertion that the unsigned lease with addendum was fully in effect, he has, since the completion of the second five-year option period, been a month-to-month

tenant. As such, his tenancy is subject to termination upon proper notice by landlord.

I would therefore remand this cause for entry of judgment for landlord and to vacate the order for attorney fees.