August 26, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1142

RESOLUTION TRUST CORPORATION,

Plaintiff, Appellee,

v.

JERALD R. FELDMAN, ET AL.,

Defendants, Appellants.

ERRATA SHEET

The opinion of the Court issued on August 20, 1993, is
amended as follows:

On page 3, line 8, delete "in exchange" so that line reads
as follows: "exchanged its secured position for an unsecured".

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1142

RESOLUTION TRUST CORPORATION,

Plaintiff, Appellee,

v.

JERALD R. FELDMAN, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Breyer, Chief Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

J. Daniel Lindley with whom Peter Antell and Antell & Associates

were on brief for appellants.
James H. Wexler with whom Bennett H. Klein and Kotin, Crabtree &

Strong were on brief for appellee.

August 20, 1993

BOUDIN, Circuit Judge. In this appeal we revisit a suit

brought by the Resolution Trust Company ("RTC"), as receiver

for a failed bank, to collect on a promissory note given the

bank by Quinaquisset Realty Trust ("Quinaquisset"). In the

first round we affirmed the district court's dismissal of

Quinaquisset's claims against a third party. Resolution Trust

Corp. v. Driscoll, 985 F.2d 44 (1st Cir. 1993). We now

affirm the district court's entry of summary judgment for the

RTC in its action against Quinaquisset and its rejection of

Quinaquisset's counterclaims against the RTC as receiver.

In October 1987, Fox Run Realty Trust ("Fox Run")

conveyed to Quinaquisset certain condominium rights in a

property called Willowbend that Fox Run was then developing.

Quinaquisset was given these rights because it had

contributed land to the development. In a contemporaneous

transaction, Fox Run then repurchased the condominium rights,

giving Quinaquisset a $1.1 million promissory note as part

payment with the balance paid in cash. Then, in April 1989,

Quinaquisset borrowed $950,000 from Sentry Federal Savings

Bank ("Sentry"), giving it in exchange a $950,000 promissory

note which is the subject of this case. A number of

individuals signed a guaranty of this new note, and

Quinaquisset gave Sentry the $1.1 million Fox Run-

Quinaquisset note as collateral for the new note.

-2-

Fox Run was also indebted to Sentry, having obtained in

December 1986 a $13 million loan from Sentry to finance

Willowbend. In return for this loan, Sentry took back a

promissory note secured by a mortgage on Willowbend.

Sentry's mortgage was initially subordinated as to 152 acres

of Willowbend on which Quinaquisset then held a first

mortgage, but Quinaquisset released its mortgage in October

1987 when it received the condominium permit rights

subsequently repurchased by Fox Run. No one has ever

explained why Quinaquisset exchanged its secured position

exchanged its secured position for an unsecured claim of $1.1

million against Fox Run, but the consequences were evident

when Fox Run encountered financial difficulties.

In August 1989, Fox Run fell into default on its

payments to Quinaquisset. The next month, Fox Run halted

payments on its $13 million debt to Sentry. Quinaquisset had

been using the payments received from Fox Run on the $1.1

million note to cover Quinaquisset's payments to Sentry on

the $950,000 note. When Fox Run ceased to pay Quinaquisset,

Quinaquisset in turn fell into default on its own $950,000

note to Sentry. In April 1990 Fox Run and Sentry entered

into a settlement agreement under which Sentry received title

to Willowbend in return for its promise not to proceed under

the $13 million note against two individuals who had

guaranteed Fox Run's payments to Sentry. Sentry retained its

-3-

mortgage on Willowbend, and in a subsequent foreclosure sale

the property was acquired by the Evergreen Holding Company

("Evergreen"), a wholly owned subsidiary of Sentry.

In May 1990, Sentry, seeking to recover the balance of

the $950,000 note from Quinaquisset, brought suit in state

court against Quinaquisset's trustee and the individual

guarantors of the note. In September 1990, Sentry itself

failed. The RTC stepped in as its receiver, and removed

Sentry's pending state court suit against Quinaquisset's

trustee and the guarantors to federal district court.

In the district court, Quinaquisset asserted numerous

claims of its own against the RTC as successor to Sentry,

against Evergreen, and against Fox Run's trustees. It also

asserted that the alleged misconduct of these entities

rendered the Quinaquisset-Sentry note null and void.

Quinaquisset's claims against Evergreen were dismissed on a

motion for summary judgment. On May 12, 1992, the district

court entered separate judgment for Evergreen pursuant to

Fed. R. Civ. P. 54(b), and we affirmed on appeal. Driscoll,

985 F.2d at 45.

Prior to its entry of judgment for Evergreen, the

district court had on July 19, 1991, granted summary judgment

for the RTC on its claims against Quinaquisset. The court

found all but one of Quinaquisset's counterclaims to be

barred by the D'Oench, Duhme doctrine, codified as 12 U.S.C.

-4-

1823(e), which limits claims based on agreements or

understandings not reflected in bank records. See D'Oench,

Duhme Co. v. FDIC, 315 U.S. 447 (1942). The remaining claim

against the RTC was dismissed on other grounds and no appeal

has been taken as to it. On November 13, 1992, the district

court entered separate judgment for the RTC under Fed. R.

Civ. P. 54(b). The judgment included an award of attorneys'

fees and costs to RTC. This appeal followed.

In this court, Quinaquisset challenges the Rule 54(b)

certification, but instead of offering a coherent explanation

of why judgment for the RTC should have been delayed,

Quinaquisset attacks the attorneys' fee award. The district

court evidently entered a separate judgment for the RTC

because all claims between Quinaquisset and the RTC had been

resolved; the remaining claims by Quinaquisset against the

Fox Run trustees, in federal court solely on pendant

jurisdiction, were remanded to the state court. We conclude

that the judgment is properly before us.1

Turning to the merits, Quinaquisset contends that the

district court's reliance on D'Oench, Duhme to dispose of its

claims against the RTC as Sentry's receiver is mistaken. It

says that its claims against the RTC are not based on any

1The certificate may have been unnecessary. Because the
district court added a paragraph to the judgment remanding
the claims against the Fox Run trustees to state court,
apparently the judgment disposed of all remaining claims in
the federal court suit.

-5-

agreement, hidden or otherwise, between itself and Sentry,

but rather on Sentry's foreclosure and sale of Willowbend.

Quinaquisset argues that Sentry's settlement with Fox Run in

April 1990, and its subsequent foreclosure on Fox Run's

principal asset, Willowbend, destroyed the value of the $1.1

million Fox Run-Quinaquisset note deposited with the bank as

collateral for Quinaquisset's own debt, and that this

impairment of collateral in turn served to discharge

Quinaquisset's debt to Sentry.

This legal theory represents a substantial winnowing of

Quinaquisset's claims made in the district court. There,

Quinaquisset alleged that Sentry engaged in wrongful conduct

not only at the foreclosure stage but also earlier, e.g.,

with respect to Quinaquisset's October 1987 discharge of its

mortgage on part of Willowbend and its reconveyance of

condominium permit rights to Fox Run. Quinaquisset also made

claims, likely foreclosed by D'Oench, Duhme, suggesting that

Sentry had privately promised to assure that Fox Run would

repay Quinaquisset the $1.1 million.

In fairness to the district court, it has often been

difficult among the welter of claims to be sure what

Quinaquisset was actually arguing at various points. Nor

does the RTC help matters when it presses, as usual, a

reading of D'Oench, Duhme so broad that one is reminded of

sovereign immunity claims made by independent nations. In

-6-

any event, whether to avoid D'Oench, Duhme or for some other

reason, Quinaquisset has now reduced its legal position to a

single claim (against the RTC) and defense (against the RTC's

own suit) based on the impairment of the value of the $1.1

million note given to Sentry as collateral for the

Quinaquisset note. This streamlined position may help

Quinaquisset to avoid application of the D'Oench, Duhme

doctrine--although the RTC claims that the doctrine applies

anyway--but the strategy raises its own problem: the lack of

any legitimate theory of liability. The gist of what

happened, in relation to the foreclosure, was that Sentry

held the mortgage on Willowbend to secure the $13 million

loan to Fox Run, Fox Run stopped paying, and Sentry then

foreclosed the mortgage and applied the proceeds to the

debt.2 This left Quinaquisset's $950,000 note to Sentry

still unpaid and the RTC proceeded with Sentry's prior suit

to collect. These circumstances provide scant basis for a

claim against Sentry or the RTC, or a defense against

collection of the unpaid note.

Quinaquisset relies centrally on section 3-606 of the

Massachusetts Commercial Code, Mass. Gen. L. ch. 106, 3-

2As noted, Sentry also received a conveyance of title
from Fox Run, and Sentry in exchange released two individuals
who had guaranteed payment of the Fox Run-Sentry note. This
conveyance was subject to the mortgage, but presumably
assured that Fox Run would not challenge the foreclosure.

-7-

606. That section, titled "Impairment of Resource or of

Collateral," states in pertinent part:

(1) The holder [of an instrument] discharges any
party to the instrument to the extent that without
such party's consent the holder

(a) without express reservation of rights
releases or agrees not to sue any person against
whom the party has to the knowledge of the holder a
right of recourse or agrees to suspend the right to
enforce against such person the instrument or
collateral or otherwise discharges such person,
except that failure or delay in effecting any
required presentment, protest, or notice of
dishonor with respect to any such person does not
discharge any party as to whom presentment,
protest, or notice of dishonor is effective or
unnecessary; or

(b) unjustifiably impairs any collateral for
the instrument given by or on behalf of the party
or any person against whom he has a right of
recourse.

Although invoked by Quinaquisset, subsection (1)(a) does

not by any stretch of the imagination apply in this case.

With respect to the Quinaquisset-Sentry note--the subject of

this suit--Sentry never purported to release anyone from, nor

promised not to sue anyone under, this note. The only

releases issued by Sentry had nothing to do with the

Quinaquisset-Sentry note: they were releases of the

individual guarantors of Fox Run's debt to Sentry, a debt for

which Quinaquisset was not responsible since it was never a

party to nor a guarantor of the Fox Run-Sentry note.

Turning to subsection (1)(b), Quinaquisset argues that

Sentry divested Fox Run of Willowbend by the transfer of

-8-

title from Fox Run followed by the mortgage foreclosure.

This in turn, says Quinaquisset, meant that Fox Run's

principal asset was no longer available to Quinaquisset to

back up Fox Run's debt to Quinaquisset. This is quite true,

although somewhat misleading.3 It might also be said that,

in some sense, Sentry's actions "impaired" the "collateral

for the instrument," if collateral is taken to be the Fox

Run-Quinaquisset note which Sentry held to secure the

Quinaquisset-Sentry note and that latter note is called "the

instrument."

But subsection (1)(b) requires that the impairment be

"unjustifiabl[e]" and we think it absurd to argue, as

Quinaquisset does without a shred of authority, that it was

unjustifiable for Sentry to foreclose on property for which

it held the mortgage when a default occurred on the secured

debt. That is just what security is there for. The fact

that this security was an asset of a party, Fox Run, who also

had a debt to Quinaquisset meant that Quinaquisset was made

worse off by the foreclosure. That is the normal fate of

unsecured creditors when the bankrupt's only asset is already

pledged.

3It is misleading because Willowbend was not much of an
asset, even in Fox Run's hands, so long as it was subject to
a mortgage to secure a defaulted debt apparently as large or
larger than the value of Willowbend.

-9-

Quinaquisset might have been better off if Sentry had

pursued Fox Run's guarantors instead of looking to Willowbend

to satisfy Fox Run's debt, but the guarantees were to Sentry

and the mortgage ran to Sentry. Sentry's decision to forgo

its claims against the Fox Run guarantors in favor of a

trouble-free sale of the property was an entirely reasonable

choice which was Sentry's to make. Sentry is not responsible

for Quinaquisset's dilemma; if Quinaquisset's claim against

Fox Run is illusory, it has no one but itself (and possibly

Fox Run) to blame.

Since Quinaquisset has failed to set forth a cause of

action or defense against Sentry under section 3-606 (and,

thus, against the RTC as receiver), we sustain the district

court on that ground. See Doe v. Anrig, 728 F.2d 30, 32 (1st

Cir. 1984) (court may affirm on a ground not relied on by the

district court). We need not address the RTC's numerous

other arguments as to why section 3-606 should not apply.

Other versions of Quinaquisset's claims against Sentry made

in the district court may properly have been dismissed on

grounds of D'Oench, Duhme, but since these versions have not

been argued in this court, we have no occasion to consider

them.4

4Quinaquisset also complains that Sentry, and then the
RTC, declined to surrender the Fox Run-Quinaquisset note
after the foreclosure so that Quinaquisset could pursue its
rights under the note. But (assuming the note still had
value after the foreclosure), the note remained security for

-10-

The final issue is the district court's award of

attorneys' fees to the RTC. Under the terms of the guaranty

supporting Quinaquisset's note to Sentry, the individual

guarantors agreed not only to guarantee the Quinaquisset debt

but to pay all costs and attorneys' fees incurred by Sentry

"in connection with the enforcement of . . . [Sentry's]

rights under, this Guaranty." The district court awarded

the RTC $79,374 in legal fees for the district court suit,

and it held that the guarantors were jointly and severally

liable for this amount.

Quinaquisset objects to the portion of the award

attributable to the Evergreen phase of the litigation. It

argues that the claims against Evergreen were not within the

scope of the guaranty and that the request for such fees is

in any event untimely because it was made well after the

separate judgment in favor of Evergreen. We consider the

scope issue first. On the issue of interpretation of the

guaranty, our review is plenary; neither side relies on

anything other than the language of the guaranty, which

extends to "all" costs and attorneys' fees of Sentry "in

connection with" the enforcement of Sentry's rights under the

guaranty.

Quinaquisset's debt to Sentry; Sentry says, as one might
expect, that the conditions for returning the note had not
been satisfied; and Quinaquisset offers no reply.

-11-

Although this suit began with Sentry's efforts to

collect against the Quinaquisset guarantors, Quinaquisset

then asserted separate third-party claims against Evergreen.

The only colorable claim against Evergreen was an attempt to

undo the foreclosure of Sentry's mortgage on Willowbend.

Driscoll, 985 F.2d at 47. We agree that it might be too much

of a stretch of the "in connection with" language to treat

this phase of the litigation--if there were nothing more to

Evergreen's involvement--as any part of the enforcement of

Sentry's rights under the Quinaquisset-Sentry note.

But there was more to Evergreen's involvement. In the

answer to Sentry's complaint Quinaquisset asserted that the

conduct of Sentry's subsidiary or affiliate, i.e., Evergreen,

was a defense to Sentry's suit against the guarantors on the

Quinaquisset-Sentry note; and in the third-party complaint

against Evergreen, Quinaquisset said that the conduct of

various entities including Evergreen made the note null and

void. While this claim or defense as to Evergreen evaporated

under scrutiny, the allegations made it essential for the RTC

to defend Evergreen as part of Sentry's own collection suit

against the guarantors.

As for timeliness, Quinaquisset's objection rests on a

decision of this court, White v. New Hampshire Dep't of

Employment Security, 629 F.2d 697 (1st Cir. 1980). There,

this court held that a motion for attorneys' fees under 42

-12-

U.S.C. 1988 came too late when made over four months after

entry of a final judgment adopting a consent decree and

apparently ending active litigation in the case.

Quinaquisset fails to mention that the decision was reversed

over a decade ago by the Supreme Court on the very point at

issue. 455 U.S. 445 (1982). In any event, there was no

untimeliness here even under our original decision in White,

so the objection is doubly without merit.

Attorneys' fees were not sought until after the separate

judgment in favor of Evergreen but Evergreen itself had no

claim to attorneys' fees. Rather, the guaranty ran in favor

of Sentry, now the RTC as receiver. The RTC did seek

attorneys' fees for all its work, including the defense of

Evergreen's actions, before a final judgment was entered in

its favor.

Lastly, we affirm the district court's decision that

each guarantor is individually responsible for the full

amount of attorneys' fees. Quinaquisset argues that the

attorneys' fee should have been apportioned among guarantors,

just as liability for the underlying debt was apportioned;

the guaranty made each guarantor liable for only $150,000 (or

$75,000 in a few cases) of the underlying $950,000 debt, as

provided in a schedule attached to the guarantee. The short

answer is that liability for costs and attorneys' fees rests

on a different provision of the guaranty that made the

-13-

"Guarantors" liable for such costs and fees without

limitation.

A promise cast in these terms normally makes each person

liable for the full sum, whether the liability is described

as joint, several, or both. 4 A. Corbin, Contracts 928

(1951). Distinctions among those concepts (joint, several,

joint and several) relate to other matters, such as joinder

and release, not to the amount of liability. The amount of

liability can be contractually limited by specifying that the

promisors are liable only for specific amounts, Corbin,

supra, 925, at 703-04, but in this case no such limitation

was attached to the promise to pay collection costs and

attorneys' fees.

The judgment of the district court is affirmed.

-14-