**FEDERAL DEPOSIT INSURANCE CORPORATION, As Receiver of the New Bank of New England, Plaintiff,**

v.

**Spencer M. KAGAN, Ronald S. Rubin and George S. Linsky, Individually and as they are Trustees of Seacoast Realty Trust; Dale Peatman, Alan Finn, Alan and Sandra Belinfante, Arthur Sandler, Mark Andler, Stanley Burba and Philip Linsky, Defendants.**

Civ. A. No. 91–10406–WJS.

United States District Court, D. Massachusetts.

Jan. 3, 1995.

Robert D. Cultice, Goldstein & Manello, Boston, MA, for plaintiff.

Charles Kagan, Stephen F. Murray, Kagan & Kagan, P.C., Revere, MA, Jeffrey T. Angley, Jeffrey J. Phillips & Associates; Matthew H. Feinberg, Matthew A. Kamholtz, Boston, MA, Scott M. Grover, Tinti, Quinn & Savoy; and Timothy W. Demakis, Salem, MA, for defendants and counterclaimants.

Paul R. Gupta, Nutter, McClennen & Fish, Thomas P. Gorman, and John C. LaLiberte, Sherin & Lodgen, for counterdefendant.

### FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT

SKINNER, Senior District Judge.

In this action, the Federal Deposit Insurance Corporation ("FDIC") seeks to recover on alleged guarantees of the obligations of the trustees of the Seacoast Realty Trust to the now defunct Essexbank. Summary judgment has been entered in favor of the FDIC against Spencer M. Kagan and Ronald S. Rubin. George Linsky and Alan Finn have filed bankruptcy petitions, and the FDIC does not seek judgment against them in this action. Dale Peatman, Alan and Sandra Belinfante, Arthur Sandler, Mark Andler, Stanley Burba and Philip Linsky have denied liability on the ground that the purported guarantees which they signed were of no legal effect, and their subsequent alteration occurred without their knowledge or authorization. The issue raised by their denials of liability were tried before me, without jury, on November 18, 19 and 20, 1994.

### FINDINGS OF FACT

Kagan, Rubin and George Linsky ("the trustees") were real estate developers who had joined in several successful real estate transactions in the early 1980's. Kagan was also a lawyer, much of whose practice concerned real estate transactions, many of which were with Essexbank. In early 1986, the trustees decided to invest in two brick apartment houses located at 135 Ocean St. and 66 Bassett Street in Lynn, Massachusetts ("the properties"). The properties were to be purchased for $2,700,000, financed in part by a first mortgage loan from Essexbank in the amount of $2,100,000 and by a seller's second mortgage in the amount of $200,000. In order to make up the balance and to provide working capital, the trustees were required to raise an additional $600,000.

In order to raise this sum, the trustees successfully solicited each of the other eight defendants ("the investors") to purchase a 6% interest in a partnership for $50,000.

The balance of $200,000 was contributed by the three trustees, who together acquired a 52% interest in the partnership, named the Seacoast Realty Partnership. This was all embodied in a partnership agreement signed by the trustees and the investors and dated May 15, 1986. The stated purpose of the partnership was to "acquire, hold, operate, improve, lease, sell and otherwise manage" the properties. The investors were friends or clients of the trustees, but had no significant experience in the development or management of real estate, except for Arthur Sandler, who had participated in one other venture with Kagan, Rubin and George Linsky. As far as appears, the partnership was a general partnership, but section 6 provided that capital deficiencies were to be made up by contributions by the partners in proportion to the percentage of their ownership. A brochure was prepared by the trustees for the purpose of encouraging the investors to participate in the project. This brochure contained a statement that the partners would be general partners and individually liable on the mortgage note. The evidence does not establish by a preponderance that this brochure was ever shown to the investors.

In any case the acquisition of the properties was not structured in the manner apparently contemplated by the partnership agreement. The partnership did not become the owner of the properties. Instead, the trustees formed the Seacoast Realty Trust, with themselves as the sole trustees, to hold the properties for the benefit of the Seacoast Realty Partnership. Until just before the closing, the officers of Essexbank were unaware of the partnership, and were relying solely on the credit of the trustees and the security of the properties.

Just before the closing, Theodore Regnante, Jr., the attorney for the bank, learned that the partnership was a beneficiary of the trust and told Kagan, who was handling the closing, that it was bank policy to secure the individual guarantees of the beneficiaries of the trust. Neither the bank nor Regnante knew the identity of the investors, and no investigation was ever made of their creditworthiness. Accordingly, the trustees then presented each investor with a form of guarantee, advising them that they should sign these documents in order to secure the tax advantages of the transaction, for which, under the tax law, they were required to be "at risk." I find that none of the investors thought they were guaranteeing the mortgage note, nor intended to do so. The inferences to the contrary urged by the plaintiff are not sufficiently supported by the evidence to satisfy the plaintiff's burden of proof. The investors all signed the purported guarantees, which in due course were delivered by Kagan to Regnante at the closing.

The operative language of the purported guarantees, however, was in the following form, exemplified by Exhibit 8, signed by Marc Andler:

> For good and valuable consideration, the receipt and sufficiency whereof is acknowledged, the undersigned (jointly and severally if more than one) unconditionally guarantees, in accordance with the terms hereof, and without any prior written notice, the payment and performance of all of the Obligations (as defined herein) of MARC ANDLER (the "Borrower"), to Essexbank, a Massachusetts trust company with a principal place of business in Peabody, Massachusetts (the "Bank").

Regnante, an experienced real estate lawyer, immediately recognized that these purported guarantees were worthless for two reasons: (1) one's guarantee of one's own obligation is a worthless redundancy, and (2) the investors had no obligation to Essexbank since the note and mortgage were to be signed only by the trustees. Regnante returned the purported guarantees to Kagan, who he thought represented the parties. Regnante told Kagan, "Either get new guarantees, or, *if authorized,* get corrected ones." (T. 1–43:22) [Emphasis supplied]

Notwithstanding the lack of valid guarantees, the closing was completed, and the deed and mortgage deed were recorded the same day, May 15, 1986.

Kagan thereupon rewrote the documents so that each investor guaranteed the obligations of "Spencer M. Kagan, Ronald S. Rubin and George S. Linsky, Trustees of

Seacoast Realty Trust (the "borrower"), to Essexbank [etc.]." He did not secure new signatures to the rewritten guarantees, but simply attached the initial signature page. He did not seek authorization from any of the investors, and he did not inform them of the change. Kagan and the investors all agree that Kagan was not acting as attorney for the investors in this transaction, but only as a partner and trustee. The investors did not learn of the alteration until the rewritten documents were produced in the course of discovery in this action. The rewritten guarantees were delivered to Regnante on May 19, 1986, after the closing documents were recorded.

The existence of apparent authority is a question of fact. *Binkley v. Eastern Tank, Inc.,* 831 F.2d 333 (1st Cir.1987). I find as a fact that Kagan did not have either express, implied or apparent authority to alter the previously executed documents.

In 1989, the trustees defaulted on the note, and the mortgage was foreclosed. The properties were sold for $750,000, leaving a deficiency of principal and accrued interest of $2,764,989.08 as of September, 1994.

Essexbank was purchased by the Bank of New England. Upon the failure of the Bank of New England, its assets and liabilities were assumed by the New Bank of New England, which in turn, upon its failure, was taken over by the FDIC. This action was commenced by the Bank of New England in the state superior court; the defendants' answers raising the above defenses were filed in that court before the take over by the FDIC and the removal of the case to this court.

### RULINGS OF LAW

The plaintiff seeks to recover on the altered purported guarantees on several theories:

1. *Apparent Authority.*

■ The plaintiff's first point is that under M.G.L., c. 108A, § 9, and the general common law, one partner is the agent for the others in carrying out the purposes of the partnership in the ordinary course. The statute is not so broad, however. It provides that a partner is the agent of the *partnership,* not of the individual partners. It provides as follows:

(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, *including the execution in the partnership name of any instrument,* for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. [Emphasis supplied]

(2) An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

\* \* \* \* \* \*

None of the parties have submitted a Massachusetts case on point, and I have found none concerning the authority of a partner to bind individual partners to the guarantee of the obligation of others; namely, that of the trustees to pay the mortgage note. To be sure, the altered guarantees did benefit the partnership in that they enabled the partnership's investment to go forward, but these instruments were not executed in the partnership name, as described in the quoted statute. If the partnership had purchased the properties, and been obligated on the mortgage note, it is clear that Kagan's signature on the note would have bound the other partners, and as general partners, they would have been individually liable. The transaction was not structured in this way, however, and the trustees were inserted as the principal obligors.

In my opinion, the altering of executed guarantees of the obligation of others is not carrying on business "in the usual way."

Regnante did not think so either. He did not assume that Kagan was automatically authorized to "correct" the documents. He said to Kagan, "Either get new guarantees, or, *if authorized,* get corrected ones." [Emphasis supplied]

██ All parties correctly assert in their memoranda that apparent authority depends upon some conduct by the putative principal which would lead a reasonable person to rely on the putative agent's authority. The conduct of the putative agent is not sufficient. *Hudson v. Mass. Property Underwriting,* 386 Mass. 450, 457, 436 N.E.2d 155 (1982). There is no evidence of any such conduct other than the execution of the partnership agreement, which, as I have ruled, is insufficient to authorize the alteration of a personal guarantee.

██ To the extent that reasonable reliance by a third person is an element of apparent authority to be established by the plaintiff, the issue in this case is not the usual one of reasonableness, but whether there was any reliance at all. As indicated above, Regnante did not assume Kagan's authority. Furthermore, Regnante caused the closing documents to be recorded before he had received the altered guarantees. At the time, the guarantees were obviously of little significance to Essexbank, since neither Regnante nor the bank knew who the purported guarantors were, or what they were worth.

To the extent that apparent authority may be a mixed question of fact and law, I rule that the plaintiff has not established the legal prerequisites for a finding of apparent authority.

### 2. *Actual or Implied Authority.*

There was no evidence of actual authority given by the investors to rewrite their guarantees. The plaintiff urges that authority should be implied because it was the investors' original intention to guarantee the trustees' obligation on the mortgage note. The evidence is, however, that they were never informed that such was the purpose of the guarantee, and they all vehemently deny any intention to guarantee a mortgage debt in the amount of $2,100,000. The plaintiff's skepticism about their testimony is no substitute for evidence to the contrary, where the plaintiff has the burden of proof.

### 3. *Ratification.*

██ While it is true that the investors accepted the benefit of the transaction (such as it was), they can not be said to have ratified a material document alteration that they never knew occurred until discovery in the course of this litigation.

### 4. *D'Oench, Duhme.*

██ The plaintiff further relies on the doctrine of *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1940), as applied by our circuit in *FDIC v. Caporale,* 931 F.2d 1 (1st Cir.1991). The net gist of these cases is that the claims of the FDIC are not subject to the defense of unauthorized alteration if the defendants were negligent in a manner likely to deceive the FDIC, which is entitled to rely on the records of the bank which it has taken over. In *FDIC v. Caporale,* the defendants had executed notes in which the amounts were left blank. The court held that this was such negligence, because it was reasonably foreseeable that a bank officer might supply an amount greater than that agreed upon. In my opinion the plaintiff has not adduced sufficient evidence to warrant a finding that Kagan's alteration of the purported guarantees without notice was reasonably foreseeable. Even if the evidence were legally sufficient, I would not find it so as a fact.

I rule that the FDIC acquired the altered guarantees as a holder in due course, but they are nevertheless subject to the defense of fraud in the factum, where the documents were materially altered without the knowledge of the defendants. *FDIC v. Turner,* 869 F.2d 270 (6th Cir.1989); see *In Re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1346 (1st Cir.1992).

### ORDER FOR JUDGMENT

In view of the foregoing findings and rulings it is not necessary to consider the plaintiff's allegations that some of the defendants made fraudulent transfers, because their liability to the plaintiff has not been established. Accordingly I order that judgment for the defendants be entered forthwith.